# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———————

No. 18-20594

———————

UNITED STATES OF AMERICA,

> Plaintiff – Appellee,

v.

GEORGE KOUTSOSTAMATIS,

> Defendant – Appellant.

———————

Appeal from the United States District Court
for the Southern District of Texas

———————

United States Court of Appeals
Fifth Circuit

**FILED**
April 15, 2020

Lyle W. Cayce
Clerk

Before ELROD, WILLETT, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

George Koutsostamatis worked for BP. He posed as a hacker and threatened to release sensitive information unless BP paid him a fortune in cryptocurrency. BP contacted the FBI, and the FBI asked BP to help identify the purported hacker. BP used its own digital security team and outside contractors to do just that. With BP's help, the FBI uncovered Koutsostamatis's crime. He pleaded guilty to one count of wire fraud. His sentence included an order to pay restitution in the amount of $552,651 for expenses BP incurred investigating his scheme. Now, he argues those expenses aren't covered by the Mandatory Victims Restitution Act. We agree.

No. 18-20594

I.

We begin with the law of restitution. Then we turn to Koutsostamatis's case.

A.

A federal court cannot order restitution without statutory authorization. *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Starting in 1925, federal courts were authorized to order restitution as a part of probation. *See* Cortney E. Lollar, *What Is Criminal Restitution?*, 100 IOWA L. REV. 93, 96 n.5 (2014). For the bulk of the twentieth century that was essentially the extent of federal restitution. *Ibid.*

Then came the victims' rights movement of the 1970s and 1980s. *See Papagno*, 639 F.3d at 1096. In 1982, Congress passed and President Reagan signed the Victim and Witness Protection Act ("VWPA"), Pub. L. No. 97-291, 96 Stat. 1248, 1253 (codified as amended at 18 U.S.C. § 3663). The VWPA authorized restitution for victims of most federal crimes. *Papagno*, 639 F.3d at 1096. And it allowed judges to order restitution for the value of lost property, the expenses of recovering from bodily injury, and the cost of funerals. *Ibid.*

Congress expanded restitution again in 1994. That year, Congress passed and President Clinton signed legislation that amended the VWPA. *See* Pub. L. No. 103-322, § 40504, 108 Stat. 1796, 1947 (codified at 18 U.S.C. § 3663(b)(4)). With that addition, courts gained the power to order restitution to "reimburse the victim for lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Ibid.* The same year, restitution became mandatory under the Violence Against Women Act ("VAWA"), which required restitution in "the full amount of the victim's losses" for victims of domestic violence and certain sex-

2

No. 18-20594

related crimes. *See* Pub. L. No. 103-322, 108 Stat. 1904 (codified as amended at 18 U.S.C. § 2248).

Two years later, restitution became mandatory for a much larger set of federal crimes under the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132, § 204, 110 Stat. 1214, 1227 (1996) (codified as amended at 18 U.S.C. § 3663A). The MVRA kicks in when (1) the underlying offense is a "crime of violence," an "offense against property . . . including any offense committed by fraud or deceit," or one of two specific crimes concerning tampering with consumer products or theft of medical products, and (2) an identifiable victim suffers a physical or pecuniary loss. *See* 18 U.S.C. § 3663A(c)(1). In such cases, the MVRA requires restitution for the same kinds of expenses for which the VWPA allows restitution (*i.e.*, the value of lost property, the expenses of recovering from bodily injury, and the cost of funerals). *Compare id.* § 3663A(b), *with id.* § 3663(b). And "in any case," the MVRA requires the defendant to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Id.* § 3663A(b)(4). Koutsostamatis's case requires us to determine the limits of the "other expenses" covered by § 3663A(b)(4).

### B.

Koutsostamatis worked for BP in Chicago as a refining supply economist. In 2017, he broke bad: Koutsostamatis took trading information and personally identifiable information about hundreds of BP employees from BP's network, and then sent BP an email from an anonymous, foreign email account posing as a hacker. He threatened to release the information he'd pulled from the network unless BP paid him 125 bitcoins (at that time, worth about $340,000).

Koutsostamatis's threats continued for the next 40 days. At one point, to display the depth of his "hack," Koutsostamatis sent BP a recording of the audio at a BP "town hall" meeting that had taken place on the Chicago trading floor. In an email, Koutsostamatis claimed to have recorded the event by hacking into a microphone. In reality, he just used his own phone.

Within hours of the first extortionist email, BP contacted the FBI. The FBI, in turn, asked for BP's help investigating the breach of BP's network. BP's systems are massive and complex—it has over 80,000 employees working in more than 80 countries. And Koutsostamatis's crime impacted employees in the United States, the United Kingdom, and Germany. So, in response to the FBI's request, 44 members of BP's digital security team, along with outside contractors, audited its servers to determine the source of the breach. Other outside contractors conducted forensic analysis on the audio recording of the town hall. Those efforts helped identify Koutsostamatis as the "hacker." And eventually, Koutsostamatis pleaded guilty to one count of wire fraud.

During sentencing, BP's Donna Weimer testified about the costs BP incurred in discovering the fraud. The costs fell into the following categories:

- BP spent $423,267 on its own digital security team. Weimer explained that "[t]hose expenses were incurred because we had to have our digital security team help the FBI in the investigation." Given "the size and the massive amount of emails, IMs and web browsers that we needed to take a look at," Weimer said, the FBI "needed BP's assistance."

- BP spent $108,389 on "forensic services" by KPMG. As to that expense, Weimer explained, "there was just a lot of IMs, emails, web activity to go through, so it was additional digital security services that they helped provide."

- BP spent $17,875 on server auditing and logging by Varonis. Weimer noted that "Varonis was a software we used to help identify the breach." The software allowed BP to know "when someone was accessing certain files."

No. 18-20594

- Finally, BP spent $3,120 on audio review by Diligence Forensics. Because Koutsostamatis had sent in an audio file of a BP town hall held on the trading floor in Chicago, BP investigated whether someone "was able to breach that or get that audio file he had going through a web or a computer or if it was actually someone on the trading floor itself who was actually taping and recording that town hall."

In total, the expenses amounted to $552,651. Koutsostamatis didn't object to the amounts of the expenditures, but he did argue those expenses weren't covered by the MVRA.

The district court disagreed. Again, in cases like this one, the MVRA says courts must order restitution for the victim's "lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). The district court concluded that BP's expenses were the sort of "other expenses" covered by the MVRA. As a result, in addition to a sentence of 27 months in prison and three years of supervised release, the court ordered Koutsostamatis to pay restitution for BP's expenses in the amount of $552,651.

Koutsostamatis challenges the legality of the restitution order under the MVRA. Our review is *de novo*. *United States v. Mathew*, 916 F.3d 510, 515 (5th Cir. 2019).

## II.

Koutsostamatis first argues that BP's efforts didn't constitute "participation" in the FBI's investigation. That's wrong. Next, he argues that BP didn't incur "other expenses" under the MVRA. That's right.

## A.

First, Koutsostamatis argues BP's expenses weren't "incurred during participation in the [FBI's] investigation . . . ." 18 U.S.C. § 3663A(b)(4).

5

No. 18-20594

Instead, he claims the expenses were "part of a private investigation the results of which [were] handed over to the government."

Not so. Start with the ordinary meaning of "participation." Generally, participation means "[t]he act of taking part in something, such as a partnership, a crime, or a trial." *Participation*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Papagno*, 639 F.3d at 1098–99 (discussing the meaning of "participation" in this statute). At sentencing, BP's Donna Weimer testified that "[t]he FBI directed us to try to identify the breach within our systems and also help identify the perpetrator." That plainly counts as "participation" in an investigation.

The Supreme Court's interpretation of the MVRA reinforces this commonsense conclusion. In *Lagos v. United States*, 138 S. Ct. 1684 (2018), the Court observed that this provision of the MVRA doesn't cover "expenses incurred *before* the victim's participation in a government's investigation began." *Id.* at 1690. Instead, the Court noted that the statute covers only expenses "incurred *during* participation in the investigation." *Ibid.* (quoting 18 U.S.C. § 3663A(b)(4)). So the company in *Lagos* couldn't get restitution for the costs of a private investigation it had launched long before contacting the government. *Ibid.* In stark contrast, BP contacted the FBI within three hours of receiving the first extortionist email. Then BP incurred the relevant expenses. Because these expenses were incurred subsequent to the Government's request for help, they satisfy the participation requirement of § 3663A(b)(4).

## B.

Next we consider whether BP's expenses constitute "other expenses" within the meaning of § 3663A(b)(4). Here we agree with Koutsostamatis. Statutory text, usage, and *Lagos* lead us to conclude that they are not.

6

No. 18-20594

1.

In statutory interpretation, we have three obligations: "(1) Read the statute; (2) read the statute; (3) read the statute!" HENRY J. FRIENDLY, BENCHMARKS 202 (1967) (attributing the treble commandment to Justice Frankfurter); *accord Whitlock v. Lowe (In re DeBerry)*, 945 F.3d 943, 947 (5th Cir. 2019) ("In matters of statutory interpretation, text is always the alpha. Here, it's also the omega."). The statutory text provides: "The order of restitution shall require that such defendant . . . in any case, reimburse the victim for lost income and necessary child care, transportation, *and other expenses* incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4) (emphasis added). The whole provision concerns expenses for which restitution is required when "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." *Ibid.* Section 3663A(b)(4) begins by listing certain, specific expenses: lost income, child care, and transportation. *Ibid.* Then comes the residual clause, which requires restitution for "other expenses." *Ibid.*

The Government strips the residual clause of its context. In its briefing, the Government framed the question as whether BP's expenses were "necessary . . . other expenses incurred during participation in the government's investigation." The Government is absolutely right to modify "other expenses" with "necessary." Likewise, the Government is correct to tie the phrase to participation in the Government's investigation. But it's wrong to isolate "other expenses" from the preceding list of specific, enumerated expenses. Text should never be divorced from context. *Cf. Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 415 (2005) (noting that "[s]tatutory language has meaning only in context").

7

No. 18-20594

Read in full context, the residual clause is more limited than the Government would have it. It would be rather strange for the specific items in a list to be "the kind of expenses that a victim would be likely to incur when he or she . . . misses work," *Lagos*, 138 S. Ct. at 1688, but then for the catchall phrase of the same list to mandate restitution for digital forensics services. Think about it: The costs of a babysitter, a tank of gas, a parking meter—and a 44-person digital security team. One of these things is not like the others. In our view, that is plain from the text of § 3663A(b)(4).

Our reading of the text is supported by tried-and-true tools of statutory interpretation—*noscitur a sociis* and *ejusdem generis*. Both canons have deep roots in our legal tradition. *See, e.g.*, *Hay v. Earl of Coventry*, (1789) 100 Eng. Rep. 468, 470 (KB) (attributing the rule of *noscitur a sociis* to Lord Hale); *Archbishop of Canterbury's Case*, (1596) 76 Eng. Rep. 519, 520–21 (KB) (using *ejusdem generis*). Both canons remain relevant today. *See Lagos*, 138 S. Ct. at 1688–89 (using *noscitur a sociis*); *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1625 (2018) (using *ejusdem generis*). For centuries, courts have used these canons to interpret texts. Courts therefore presume that "Congress legislates with knowledge of [these] basic rules of statutory construction." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991).[1]

We start with "the commonsense canon of *noscitur a sociis*." *United States v. Williams*, 553 U.S. 285, 294 (2008). Like *ejusdem generis*, it's lawyer

---

[1] Empirical research suggests the presumption is an accurate one, at least for the Latin canons. *See* Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 STAN. L. REV. 901, 952 (2013) (noting that *noscitur a sociis* and *ejusdem generis* seem to be "accurate judicial approximations of the way that drafters put language together").

No. 18-20594

Latin for a simple principle.[2] The maxim means "a word may be known by the company it keeps." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 287 (2010) (quotation omitted). This kind of commonsense reading is especially helpful when facing a phrase like "other expenses." Just last year, the Supreme Court confronted the question of whether attorney's fees fell within the statutory phrase "[a]ll of the expenses of the proceedings." *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 367 (2019) (analyzing 35 U.S.C. § 145). The Court acknowledged that without more context, the word "expenses" can encompass a wide range of meanings. *See id.* at 372 (surveying dictionary definitions). But "[r]eading the term 'expenses' alongside neighboring words in the statute," the Court found the phrase had a more precise content—one that excluded attorney's fees. *Ibid.*

We take the same approach here. First, one condition limits all the expenses for restitution under this provision: Those expenses must be "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Those words do not readily call to mind a company's own expenses for investigative services. Such expenses may be part of participation in a government investigation, but they are surely atypical. And, as noted above, BP's expenses bear little resemblance to the expenses expressly listed. To give "other expenses" such broad import would contravene the "familiar principle

---

[2] Both of these canons reflect the notion that we understand particular words or phrases in relation to the words or phrases surrounding them. Yet the canons are distinct because *ejusdem generis* is only properly applied when interpreting a specific-to-general sequence of words. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 205 (2012). As is true here, however, the two canons often work in tandem. "[T]he rule of *noscitur a sociis* and the rule of *ejusdem generis* produce identical results in most situations." 2A SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 47:16 (7th ed.).

9

of statutory construction that words grouped in a list should be given related meaning." *Third Nat'l Bank in Nashville v. Impac Ltd., Inc.*, 432 U.S. 312, 322 (1977); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 195 (2012).

Indeed, the particular placement of "other expenses" within § 3663A(b)(4) reinforces that conclusion and indicates that *ejusdem generis* should also be applied. "The *ejusdem generis* canon applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics . . . ." SCALIA & GARNER, *supra*, at 199. Where it applies, *ejusdem generis* "limits general terms which follow specific ones to matters similar to those specified." *United States v. Aguilar*, 515 U.S. 593, 615 (1995) (Scalia, J., concurring in part and dissenting in part) (quotation omitted). That is, when a list of specific X's is followed by the catchall phrase "other X's," *ejusdem generis* "implies the addition of *similar* after the word *other*." SCALIA & GARNER, *supra*, at 199. Section 3663A(b)(4) "lists three specific items that must be reimbursed, namely, lost income, child care, and transportation; and it then adds the words, 'and other expenses.'" *Lagos*, 138 S. Ct. at 1688. That's a list of specific terms followed by a general term. Following *ejusdem generis*, we understand the structure of this list to imply that restitution is required for "lost income and necessary child care, transportation, and other [similar] expenses."

BP's expenses for its digital security team and outside contractors are not remotely similar to lost income, child care, or transportation. *Cf. ibid.* ("[T]he statute says nothing about *the kinds of expenses* a victim would often incur when private investigations . . . are at issue, namely, the costs of hiring private investigators, attorneys, or accountants." (emphasis added)). And again, "where, as here, a more general term follows more specific terms in a list, the general term is usually understood to embrace only objects similar in

nature to those objects enumerated by the preceding specific words." *Epic Sys. Corp.*, 138 S. Ct. at 1625 (quotation omitted). Thus, "there is no textually sound reason to suppose the final catchall term should bear such a radically different object than all its predecessors." *Ibid.*

2.

The rest of the MVRA supports the same conclusion. Consider the statute's definition of victims to whom such restitution is required. According to the MVRA, a "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered . . . ." 18 U.S.C. § 3663A(a)(2). In some cases, that may include "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Ibid.* And the MVRA provides detailed instructions for cases in which a victim "is under 18 years of age, incompetent, incapacitated, or deceased . . . ." *Ibid.* Those provisions suggest a statute that primarily covers natural persons. The same is true of some of the sorts of restitution covered. *See id.* § 3663A(b)(2) (mandating restitution for, *inter alia*, medical care, therapy, and reimbursement for lost income in cases involving bodily injury to a victim); *id.* § 3663A(b)(3) (mandating restitution for "necessary funeral and related services" in cases where bodily injury results in a victim's death).

That's not to say a corporate victim cannot receive restitution under the MVRA—far from it. But we do not construe "other expenses" in isolation. And the surrounding provisions of the MVRA indicate that "other expenses" are the sort of expenses a natural person incurs. As the *Lagos* Court said, § 3663A(b)(4) lists the sort of expenses "a victim would be likely to incur when he or she (or, for a corporate victim like GE, *its employees*) misses work and travels to talk to government investigators, to participate in a government

criminal investigation, or to testify before a grand jury or attend a criminal trial." 138 S. Ct. at 1688 (emphasis added). Text and context both counsel against the Government's expansive interpretation of "other expenses."

So does statutory usage. When Congress chooses a more expansive form of restitution, it deploys different language and statutory structure. Congress has time and time again passed statutes providing for mandatory restitution covering "the full amount of the victim's losses." *See, e.g.*, 18 U.S.C. §§ 2248(b), 2259(b), 2264(b), 2327(b), 1593(b). When Congress adopts that more expansive approach, it pairs that language with a different sort of list of covered expenses. *See, e.g.*, *id.* § 2248(b)(3) (defining "full amount of the victim's losses" to include various specific expenses and "*any* other losses suffered by the victim as a proximate result of the offense" (emphasis added)); *id.* § 2264(b)(3) (same); *id.* § 2259(c)(2) (defining "full amount of the victim's losses" to include various specific expenses and "*any* other relevant losses incurred by the victim" (emphasis added)); *id.* § 1593(b)(3) (defining "full amount of the victim's losses" by reference to § 2259(c)(2)); *see also id.* § 2327(b)(3) (defining "full amount of the victim's losses" simply as "*all* losses suffered by the victim as a proximate result of the offense" (emphasis added)). Those statutes offer a stark contrast to § 3663A(b)(4).

Thus statutory usage shows that Congress knows how to craft restitution statutes in broader terms that might cover BP's expenses. It did not do so here, and the contrast is telling. *Cf. Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484–85 (1996); *Papagno*, 639 F.3d at 1099–1100 & n.3. We needn't consider whether another statute, or even another provision of the MVRA, would cover BP's expenses. *Cf. United States v. Gammell*, 932 F.3d 1175, 1181 (8th Cir. 2019) (holding § 3663A(b)(1) covered certain costs related to malicious computer

attacks because those costs were related to property damage). For today, it's enough to say that § 3663A(b)(4) doesn't.

3.

Finally, the rationale of *Lagos* leads us to conclude that BP's expenses fall outside the ambit of § 3663A(b)(4). The *Lagos* Court analyzed the kinds of expenses covered by this part of the MVRA while interpreting the words "investigation" and "proceedings" in § 3663A(b)(4). Some courts, including ours, had read "investigation" to include both government and private investigations. *See Lagos*, 138 S. Ct. at 1687 (collecting cases). By contrast, the D.C. Circuit had read that provision to refer only to government investigations. *Ibid.* (citing *Papagno*, 639 F.3d at 1100).

A unanimous Court held that § 3663A(b)(4) only covers government investigations. *Lagos*, 138 S. Ct. at 1690. The Court did so by relying on *noscitur a sociis*. *Id.* at 1688–89. To determine what kinds of "investigation[s]" and "proceedings" § 3663A(b)(4) included, the Court turned to those terms' neighbors—the kinds of expenses covered. The *Lagos* Court explained that § 3663A(b)(4) addresses:

> precisely the kind of expenses that a victim would be likely to incur when he or she (or, for a corporate victim like GE, its employees) misses work and travels to talk to government investigators, to participate in a government criminal investigation, or to testify before a grand jury or attend a criminal trial.

*Id.* at 1688. In contrast, the Court observed, "the statute says nothing about the kinds of expenses a victim would often incur when private investigations . . . are at issue, namely, the costs of hiring private investigators, attorneys, or accountants." *Ibid.* The Court reasoned that the kinds of expenses listed by § 3663A(b)(4) supported its conclusion that "the

words 'investigation' and 'proceedings' . . . refer to government investigations and criminal proceedings." *Id.* at 1690.

*Lagos* goes a long way to resolving our case. If the statute "says nothing" about hiring lawyers or accountants or private investigators to carry out an investigation, *id.* at 1688, it likewise says nothing about BP's digital security team and outside contractors. Indeed, the premise that the statute "says nothing" about the costs of "hiring private investigators" would make no sense if "other expenses" covered exactly those kinds of costs. And BP's digital security team and outside contractors look an awful lot like high-tech PI's.

## C.

The Government says the statutory purpose should prevail. Not so. And the Government's counterarguments based on pre-*Lagos* decisions fare no better.

## 1.

At oral argument, the Government urged us to eschew canons and instead seek Congress's intent. It suggested that this approach would better accord with "the broad purpose of the Mandatory Victims Restitution Act . . . 'to ensure that victims of a crime receive full restitution.'" *Lagos*, 138 S. Ct. at 1689 (quoting *Dolan v. United States*, 560 U.S. 605, 612 (2010)).

Three points. First, this argument failed before. In response to a similar contention in *Lagos*, the Supreme Court explained that "a broad general purpose of this kind does not always require us to interpret a restitution statute in a way that favors an award." *Id.* at 1689. Indeed, "[n]o legislation pursues its purposes at all costs." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013) (quotation omitted).

Second, the extremely broad intent the Government divined from the MVRA—"to make the victim whole," Oral Argument at 16:19–21—would

import tort law into criminal restitution. Yet the Supreme Court has warned against doing exactly that. *See Paroline v. United States*, 572 U.S. 434, 453 (2014) ("Aside from the manifest procedural differences between criminal sentencing and civil tort lawsuits, restitution serves purposes that differ from (though they overlap with) the purposes of tort law.").[3]

Finally, what Congress says in a statute's text is the best guide to what Congress intends. *See W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991) ("The best evidence of [congressional] purpose is the statutory text adopted by both Houses of Congress and submitted to the President."); *United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 11 (2008) (discussing the "strong presumption that the plain language of the statute expresses congressional intent" (quotation omitted)). And of course, statutory text is the only species of "intent" subject to bicameralism and presentment. U.S. CONST. art. I, § 7. For all those reasons, "vague notions of a statute's 'basic purpose'" are "inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 261 (1993).

2.

We also reject the Government's argument that applying the canons here would render the phrase "other expenses" meaningless. We agree that the canons shouldn't be applied in a way that renders general statutory language nugatory. *See United States v. Buluc*, 930 F.3d 383, 391 (5th Cir. 2019). But

---

[3] To the extent a victim like BP finds its restitution lacking, it retains the option of bringing a civil lawsuit "for the full extent of its losses . . . ." *Lagos*, 138 S. Ct. at 1690. And the statutory scheme is set up to help victims who bring such suits. *See* 18 U.S.C. § 3663A(d) (incorporating by reference the enforcement provisions of 18 U.S.C. § 3664); *id.* § 3664(l) (providing that if a victim sues, "[a] conviction of a defendant for an offense involving the act giving rise to an order of restitution shall estop the defendant from denying the essential allegations of that offense in any subsequent Federal civil proceeding or State civil proceeding, to the extent consistent with State law").

our reading of "other expenses" does nothing of the sort. To give one example, suppose a victim must travel to participate in the Government's prosecution of an offense. The cost of transportation is expressly covered by the MVRA. 18 U.S.C. § 3663A(b)(4). Other costs of the victim's participation—say, food or lodging—would presumably fall within "other expenses." So saying "other expenses" does not include a 44-person digital security team is hardly the same as saying "other expenses" means nothing at all.

3.

Lastly, the Government relies on pre-*Lagos*, out-of-circuit caselaw to support its position. To be sure, most circuits took a broad view of the restitution available under this provision prior to *Lagos*. *See Lagos*, 138 S. Ct. at 1687 (collecting cases that allowed restitution for expenses incurred during private investigations). But we have recognized that *Lagos* changed the legal landscape. *See United States v. Hughes*, 914 F.3d 947, 951 n.4 (5th Cir. 2019) (discussing sources of restitution and citing *Lagos* for the proposition that "the Supreme Court recently favored a narrower reading of the MVRA"). That means the Government's discussion of pre-*Lagos* caselaw isn't particularly helpful. Nor do we see tension between our position and those of our sister circuits who have interpreted the MVRA in the aftermath of *Lagos*.[4]

\*     \*     \*

We VACATE the judgment and REMAND for resentencing in accordance with this opinion.

---

[4] In *United States v. Sexton*, the Sixth Circuit held it was not plain error for a district court to order restitution under this provision of the MVRA for certain legal fees incurred by a victim. 894 F.3d 787, 800–01 (6th Cir. 2018). That case involved plain error and legal fees. This case involves neither.