U.S. COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 24-1998, 24-3003
_____

UNITED STATES OF AMERICA

v.

JAMES P. ABRAMS,
                            Appellant
_____

On Appeal from the U.S. District Court
for the Middle District of Pennsylvania
Judge Malachy E. Mannion
No. 3:22-cr-00190-001
_____

Before: BIBAS, SCIRICA, and SMITH, *Circuit Judges*
Argued October 29, 2025
Decided January 30, 2026
_____

OPINION OF THE COURT
_____

SMITH, *Circuit Judge.*

Characterizing himself as a "modern Icarus," Op. Br. at 4, James Abrams's ("Abrams") story is, indeed, a cautionary tale. To cozen funds for a clean energy startup, Abrams furnished prospective investors with forged documents and false information that overstated the company's financial condition and business prospects. He then diverted investor funds for personal use and lied to investors to conceal his financial activities. And much like the figure from Greek mythology with whom he identifies, Abrams plummeted into the sea when a federal jury convicted him on 48 criminal counts, including 18 counts of wire fraud, 1 count of mail fraud, 5 counts of aggravated-identity-theft, 1 count of money laundering, 12 counts of unlawful monetary transactions, 4 counts of obstruction of justice, and 7 counts of making false statements. The District Court imposed a 72-month prison sentence and ordered him to pay approximately $1.2 million in restitution to the investors he defrauded.

On appeal, Abrams principally attacks the sufficiency of the evidence supporting his fraud and identity-theft convictions, pressing a host of arguments he did not present to the District Court. We hold that a bare, non-specific Rule 29 motion does not preserve every later-articulated sufficiency argument, and that the District Court did not plainly err in denying Abrams's Rule 29 motion. And Abrams's sole preserved argument, sounding in instructional error, is squarely refuted by our precedent.

2

Abrams separately contests a portion of the restitution order, which awarded attorneys' fees incurred by the investors in the course of cooperating with the Government's investigation. On that narrow point, we agree with Abrams. We hold that § 3663A(b)(4) of the Mandatory Victims Restitution Act ("MVRA") does not authorize restitution for attorneys' fees. We will thus affirm the convictions and sentence in all respects, vacate the attorneys' fees component of the October 11, 2024, order and the October 29, 2024, amended judgment, and remand for entry of an amended judgment consistent with this opinion.

## I. Background

In June 2006, Abrams, along with his father, William Abrams, founded EthosGen, a renewable energy startup. Around 2011, after William left to work for Rockwell Collins[1]—an aerospace manufacturer—Abrams became EthosGen's sole owner and operator. That was about the same time that Abrams took interest in waste-heat engines developed by Viking Heat Engines—a

---

[1] William briefly worked for another aerospace manufacturing company before moving to Rockwell Collins. Rockwell Collins experienced numerous acquisitions/mergers but was referred to as "Rockwell Collins" or "Collins" for simplicity at trial.

European firm whose technology converts waste heat from biomass into electricity. Abrams approached Michael Mastergeorge, his father's supervisor at Rockwell Collins, about potential commercial and military uses for the conversion technology. By 2013, the three companies had struck a basic arrangement: Viking would supply the engines, Rockwell Collins would integrate them with additional technology, and EthosGen would market and sell the finished systems.

In 2017, Binghamton University Foundation's Koffman Southern Tier Incubator ("KSTI") invited EthosGen to make a presentation at a "pitch" event and soon began preliminary due diligence as it considered a potential investment. As that process unfolded, Abrams supplied a series of altered or fabricated materials that portrayed EthosGen as far more established than it actually was. Abrams doctored the foundational "teaming" agreement between EthosGen, Rockwell Collins, and Viking to remove Viking and recast EthosGen as the owner and inventor of the engines. He also forged the signature of Michael Mastergeorge on the altered agreement. Similarly, Abrams modified purchase orders which Rockwell Collins had issued to Viking so that they appeared to have been issued to EthosGen. Abrams also submitted financial records that overstated the company's strength: he fabricated a 2016 federal tax return for EthosGen using the personal information of accountant

4

John Riccetti without authorization and submitted accompanying financial statements that inflated EthosGen's assets and understated its liabilities.

EthosGen's operational history was likewise overstated. Abrams supplied a customer list representing that EthosGen had installed roughly thirty systems—including for the U.S. Navy. What the list actually reflected was work largely performed by Viking or Rockwell Collins. The reality was that EthosGen itself had not sold a single engine.

To reinforce the impression that EthosGen had performed work for the U.S. Navy, Abrams circulated a contract that actually ran between the Navy (through the Pacific Northwest National Laboratory, "PNNL")[2] and Rockwell Collins. But the version he provided replaced the name of Rockwell Collins with EthosGen. It also removed references to Rockwell Collins personnel and included a forged signature of PNNL's representative Kevin Ghirardo.

Abrams's perfidies did not stop there. He produced additional doctored financial records in an effort to

---

[2] The PNNL is operated by Battelle Memorial Institute for the U.S. Department of Energy. It is not a legal entity itself.

substantiate claimed revenue that EthosGen had never realized. And he recast intellectual-property and other documents to suggest EthosGen had rights it did not have by presenting a license from Battelle Memorial Institute to use and manufacture certain polymers, which had been provided to another Abrams-owned entity, Innaventure, as if Battelle had licensed to EthosGen instead. This, he accomplished by including the forged name and signature of Battelle representative Peter Christensen. As if to outdo himself, Abrams edited an IP-development proposal between Albemarle (a chemical company) and Innaventure, to swap Innaventure for EthosGen. As a fraudster he was prolific. What he lacked, though, was a knack for the surreptitious that might have allowed him to elude detection.

KSTI's reviewers were not blind to the apparent irregularities in these financial documents. KSTI Director Daniel Mori expressed "significant concerns around the accounting systems in place," Appx668, and KSTI's finance expert Mike Driscoll described a portion of the submissions as "on its face unreliable," Appx649. Yet despite acknowledging the investment as "very high risk," Appx562, KSTI proceeded to fund the project, awarding $200,000 to purchase two engines, with a second $200,000 (second tranche) contingent on meeting specified benchmarks. Three angel investors—Elizabeth Koffman ($200,000), Albert Nocciolino ($200,000), and Russell

Hagen ($300,000)—also joined, bringing initial funding to $900,000, which EthosGen deposited into a previously empty bank account in early May 2018.[3]

Within days of the deposits, Abrams withdrew $100,500, which he used to pay various debts. Soon afterward, he moved $700,000 out of EthosGen's account, routed it through four other business accounts that he controlled—each having at the time a near-zero balance—and cycled the funds back, all "within the span of approximately 32 minutes." Appx712–716. An IRS agent testified that the transfers resembled "layering," a method of obscuring the origin of funds through complex transfers. Appx732. Abrams characterized the transfers as a "mistake," Appx756, borne out of uncertainty about "what he wanted to do." Appx720–21. Shortly thereafter, he wired most of the remaining balance—approximately $800,000—to a real estate IOLTA to purchase a residence in South Carolina. Although Abrams insisted to bank personnel that the property "would be used for business," the bank flagged the transaction as suspicious and closed his accounts because "it appear[ed] he [was] using investor funds for personal purposes." Appx720–21. At the same time, Abrams—undaunted—told investors that

---

[3] The $700,000 from the angel investors was deposited around May 4, 2018. KSTI deposited its first tranche investment of $200,000 on May 15, 2018.

the money had been used to "secure unit inventory." Appx698, 799, 839.

Release of KSTI's second $200,000 tranche hinged on attainment of three benchmarks: successful installation and commissioning of two units; execution of a manufacturing/pricing agreement with Rockwell Collins for roughly 50 units; and hiring a CFO. To show he had met those conditions, Abrams advised KSTI by email on July 11, 2018 that EthosGen had "completed installation" of a unit at the Bates Troy laundry facility and had achieved "another successful install in [the] United Kingdom in May." Appx450. None of this was true. In reality, the Bates Troy unit was merely a free demonstration, and the U.K. unit had yet to be installed as late as November 2018. When installation eventually did occur, the engine failed and had to be removed.

In August 2018, Abrams sent KSTI a purported "commissioning checklist"[4] for M.G.H. Limited, a U.K.

---

[4] A commissioning checklist is a document "used to verify that all installation, testing, and configuration steps . . . have been completed correctly before the project is handed over to the client." Liam Scanlan, *What is a Commissioning Checklist?*, HINDSITE (Jan. 13, 2025), https://www.hindsiteind.com/blog/what-is-a-

recycler, bearing the name and signature of its managing partner, Michael Harris. Appx451. Harris neither signed the document nor authorized anyone to sign for him. Abrams also supplied to KSTI what he described as a Rockwell Collins manufacturing/pricing agreement reflecting Mastergeorge's signature;[5] but Mastergeorge denied having signed it and testified at trial that no executed agreement existed. Abrams did satisfy the CFO condition by hiring Linette Rayeski, yet he denied her access to EthosGen's bank account and furnished her with forged tax returns.[6] Relying on these representations, KSTI released the second $200,000 tranche in August of 2018.

In early 2019, IRS agents questioned Abrams at his South Carolina home about the suspicious fund movements. During the interview and ensuing investigation, Abrams made a number of false statements: he asserted that EthosGen had paid Rockwell Collins for

---

commissioning-tool-understanding-its-importance-in-modern-projects.

[5] Inattentive to detail, Abrams misspelled Mastergeorge's name on the signature line, so it appeared as "Mastegeroge." Appx533; Op. Br. at 42.

[6] Abrams terminated Rayeski in December 2018 after she questioned the supposed "inventory" purchase and the South Carolina residence.

9

units installed on the U.S. Navy's Golden Bear ship and at Bates Troy; claimed his investors had agreed to pay him $200,000 annually in guaranteed compensation and that EthosGen still owed him $800,000, including for deferred compensation; professed ignorance as to who had signed the forged Rockwell Collins manufacturing agreement on behalf of Michael Mastergeorge; and likewise said he did not know who transmitted the forged Battelle contract to KSTI's diligence team.

Shortly thereafter, Abrams disclosed the ongoing IRS investigation to KSTI. He acknowledged that he had purchased a South Carolina residence with company funds but claimed that he had already reimbursed the company. He also executed a promissory note, but only for $550,000—less than the amount withdrawn—and sought investor approval for a $135,000 personal loan from EthosGen, without revealing that it was intended to retroactively cover some of the earlier withdrawal.

Eventually, a grand jury returned a 48-count indictment charging Abrams with wire fraud (Counts 1–18), 18 U.S.C. § 1343; mail fraud (Count 19), *id*. § 1341; aggravated-identity-theft (Counts 20–24), *id*. § 1028A(a)(1); money laundering (Count 25), *id*. § 1956(a)(1); unlawful monetary transactions (Counts 26–37), *id*. § 1957; obstruction of justice (Counts 38–41), *id*. § 1519; and making false statements to IRS special agents

10

on February 5, 2019 (Counts 42–46), and on February 25, 2020 (Counts 47–48), *id.* § 1001(a)(2).

The case proceeded to a nine-day jury trial. At the close of the Government's case, Abrams moved for judgment of acquittal under Federal Rule of Criminal Procedure 29(a). In doing so, Abrams's trial counsel stated merely: "I move for judgment of acquittal on [R]ule 29[(a)]. I waive argument." Appx809. The District Court denied that motion because "the presentation of evidence so far if believed by the jury would certainly satisfy the government's burden of proof beyond a reasonable doubt." *Id.* Later, during the charge conference, Abrams did not object to the government's proposed jury instructions but requested a supplemental instruction on the "good faith" defense—that the jury could not find him guilty if it found that he had "an honestly held belief . . . that by virtue of his relationships with others . . . he could substitute his name or the name of Ethosgen for the actual party." Appx165–167. The District Court declined to give the instruction because it was "not aware of any evidence in [this] case that would support a good faith defense instruction." Appx825. After deliberating for approximately three hours, the jury delivered a guilty verdict on all counts.

At sentencing, the District Court calculated a total offense level of 25 and a criminal history category of I,

thereby yielding a Sentencing Guidelines range of 81–191 months. It then imposed 48 months of imprisonment on each of Counts 1–19 and 25–48, with each term to run concurrently with the others. As to Counts 20–24, the District Court sentenced Abrams to concurrent sentences of 24 months on each of the five counts, but with those 24 months to run consecutive to the 48 months already imposed. The result: a total term of 72 months in prison. *Id.* The District Court also ordered $1.1 million in restitution to KSTI and the three angel investors.

After further briefing, the District Court amended its judgment on October 11, 2024, to include restitution for attorneys' fees "directly and proximately caused by [Abrams's] crimes." Appx13 (Oct. 11, 2024, Order).[7] Abrams timely filed notices of appeal from the May 15 and October 11 orders on May 29 and October 25, 2024, respectively.[8]

---

[7] Based on submissions from the victims, which the Court reviewed in camera, it ordered $91,588.00 to KSTI, $4,175.00 to Albert Nocciolino, and $3,337.50 to Elizabeth Koffman. The October 11 order resulted in an Amended Judgment entered October 29, 2024.

[8] The District Court had subject-matter jurisdiction over Abrams's federal criminal prosecution under 18 U.S.C. §

12

Abrams now raises four sets of issues for our review. First, he challenges the denial of his Rule 29 motion, arguing that the evidence was insufficient to support the jury's guilty verdict on the fraud counts (Counts 1–19) and the aggravated-identity-theft counts (Counts 20–24). Second, as to identity theft, he offers two fallback arguments: that the District Court's jury instructions were inadequate under *Dubin v. United States*, 599 U.S. 110 (2023) and, failing that, that 18 U.S.C § 1028A is unconstitutionally vague. Third, he argues that the District Court erred in refusing a good-faith instruction on the fraud counts. Finally, he challenges the October 11, 2024, restitution order, asserting that attorneys' fees are not recoverable under the MVRA, 18 U.S.C. § 3663A, or, alternatively, that the fees awarded were not "necessary." We address these arguments in that order.

## II. Insufficient Evidence

Abrams challenges the sufficiency of the evidence supporting both his fraud convictions (Counts 1–19) and his aggravated-identity-theft convictions (Counts 20–24). But first we must resolve a threshold question: whether Abrams's generalized Rule 29 motion preserved the specific sufficiency arguments he presses now.

---

3231. We have appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Concluding that it did not, we apply plain-error review. We then address the fraud counts and, thereafter, the aggravated-identity-theft counts, holding that the trial record comfortably supports the jury's verdicts in toto. We will therefore affirm.

## A. Standard of review

Abrams argues for *de novo* review, which is ordinarily the standard we apply to sufficiency challenges.[9] Op. Br. at 26; Rep. Br. at 2; *see United States v. Rowe*, 919 F.3d 752, 758 (3d Cir. 2019) ("Our review of the sufficiency of the evidence is plenary[.]"). The Government—urging us to extend our holding in *United States v. Joseph*, 730 F.3d 336 (3d Cir. 2013)—responds that plain-error review applies because the generalized Rule 29 motion Abrams made at trial failed to preserve the specific sufficiency arguments he now raises. We agree with the Government. The logic and policy underlying *Joseph* apply with equal force here. Accordingly, we hold

---

[9] While this standard is "plenary" as to the district court's ruling, it is still highly deferential to a jury's verdict. *See United States v. Porat,* 76 F.4th 213, 218 (3d Cir. 2023) ("[W]e must affirm [a] conviction if, considering the evidence in the light most favorable to the government, there is 'substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt.'").

that a bare, non-specific Rule 29 motion for judgment of acquittal does not preserve every specific sufficiency argument a defendant may later pursue on appeal. Plain-error review must therefore govern Abrams's sufficiency claims.

To explain why, we revisit our *Joseph* precedent. There, we drew a careful distinction between "issues" and "arguments," observing that a single "issue" can "encompass more than one" discrete "argument." *Joseph*, 730 F.3d at 340. We then held that, to preserve a suppression argument under Federal Rule of Criminal Procedure 12, a party must raise the same *argument* in the district court as the party later makes on appeal; "merely raising an *issue* that encompasses the appellate argument is not enough." *Id.* at 337. We also described the level of specificity required for preservation as "exacting." *Id.* at 341. An argument on appeal is preserved if it depends on (1) the same legal rule or standard and (2) the same facts as the argument presented to the district court. *Id.* at 341–42. Applying that framework, we concluded that the defendant's district-court challenge to probable cause as to *actus reus* did not preserve a new appellate challenge to probable cause as to *mens rea*. *Id.* at 343. As a result, we

15

concluded that the *mens rea* argument had been waived.[10] *Id*.

We have applied *Joseph* beyond the Rule 12 suppression setting. In *United States v. Grant*, we invoked *Joseph* to decide whether to review *de novo* or for plain error a defendant's argument urging us to "exten[d] [] our Court's sentencing-package doctrine to vacated sentences." 9 F.4th 186, 199–200 (3d Cir. 2021). Although the defendant broadly asked the district court for a full resentencing on all his counts of conviction after his sentence on two counts were vacated, we held that he failed "to put the District Court or the Government on notice" of, and thus preserve, his distinct sentencing-package argument. *Id*. Similarly, in *United States v. Abreu*, we applied *Joseph* to a dispute regarding the interpretation of the U.S. Sentencing Guidelines. 32 F.4th 271 (3d Cir. 2022). We concluded that the argument there had been preserved—"although [the defendant] frame[d] it slightly differently" than he had done at trial—because it relied on "both the same legal rule . . . and the same facts . . .

---

[10] "[A] suppression argument raised for the first time on appeal is waived (*i.e.*, completely barred) absent good cause." *United States v. Rose,* 538 F.3d 175, 182 (3d Cir. 2008). By contrast, an unpreserved Rule 29 argument may still be reviewed for plain error. *See United States v. Williams*, 974 F.3d 320, 361 (3d Cir. 2020).

16

presented in the District Court." *Id*. at 275–76 (second quotation from *Joseph*, 730 F.3d at 342). And in *Spireas v. Commissioner of Internal Revenue*, we extended *Joseph* into the civil realm, noting that there is "no basis" for applying a different argument/issue distinction in civil and criminal matters. 886 F.3d 315, 321 n.9 (3d Cir. 2018). We made clear there that *Joseph* "provides the governing rule" for the "threshold question of whether an argument was made" in the district court for purposes of appellate review. *Id*.

We have yet to fully resolve how *Joseph* should apply to motions for judgment of acquittal made pursuant to Federal Rule of Criminal Procedure 29. In *Williams*, we "decline[d] to import *Joseph* wholesale" to the Rule 29 context because doing so was unnecessary to our decision in that case. 974 F.3d at 361. Instead, we held that "when a Rule 29 motion raises specific grounds, or arguments (in the *Joseph* sense), all such arguments not raised are unpreserved on appeal." *Id*.[11] Thus, the defendant's Rule 29 motion at trial raising "a narrow factual argument regarding the testimony of a witness" did not preserve a distinct appellate argument concerning drug-quantity calculations. *Id*. *Williams*, however, expressly left open

---

[11] Most of our sister circuits have adopted the same, or similar, standard. *See id.* at 361 nn. 27–28 (collecting cases).

17

whether "a broadly stated Rule 29 motion preserves all arguments bearing on the sufficiency of the evidence." *Id*.; *see also United States v. Johnson,* 19 F.4th 248, 255 n.6 (3d Cir. 2021) (reaffirming that *Williams* did not hold that "a 'general' Rule 29 motion preserves all sufficiency arguments for appeal"). Confronted with that question now, we hold that a general Rule 29 motion does not preserve all sufficiency arguments later raised on appeal.[12]

Our cases underscore two animating principles of preservation doctrine. First, a party must put the district court "squarely" on notice of the point at issue, *Johnson*, 19 F.4th at 255 (citation omitted), thereby affording it "a chance to 'consider and resolve'" the matter in the first instance. *Id.* (quoting *Puckett v. United States,* 556 U.S. 129, 134 (2009)); *see also Grant*, 9 F.4th at 199 (finding that an appellate argument was not preserved where

---

[12] We are not the first circuit to reach that conclusion. The Fifth Circuit has held that "[t]o preserve *de novo* review . . . a defendant must specify at trial the *particular* basis on which acquittal is sought." *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007) (emphasis added); *see also United States v. Wadi*, 153 F.4th 465, 474–75 (5th Cir. 2025) (holding that an argument was waived on appeal where the defendant "generally moved for acquittal", but "failed to specify any particular basis for his insufficiency-of-the-evidence contention in the district court").

"defense counsel's argument . . . did not suffice to put the District Court or the Government on notice [of] what [the defendant] really sought"). That is so because the district court "is ordinarily in the best position to determine the relevant facts and adjudicate the dispute." *Puckett*, 556 U.S at 134. Indeed, "[t]he very word 'review' presupposes that a litigant's arguments have been raised and considered in the tribunal of first instance." *Freytag v. Comm'r,* 501 U.S. 868, 895 (1991) (Scalia, J., concurring in part and concurring in judgment).

Second, the presentation must be "sufficiently particularized"—that is, framed as specific arguments— because "even the most learned judges are not clairvoyant" and need not "anticipate and join arguments that are never raised by the parties." *Abreu*, 32 F.4th at 274–75 (second and third quotations from *United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010)); *cf. Doeblers' Pa. Hybrids, Inc. v. Doebler,* 442 F.3d 812, 820 n.8 (3d Cir. 2006) ("'Judges are not like pigs, hunting for truffles buried' in the record." (quoting *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.,* 309 F.3d 433, 436 (7th Cir. 2002))). That requirement is "essential to the proper functioning of our adversary system," which "rel[ies] on the litigants . . . to frame the issues for decision." *Dupree*, 617 F.3d at 728.

19

These tenets reflect a practical goal: to "encourage[] litigants to directly identify for the district court the purported grounds for error." *Johnson,* 19 F.4th at 255; *see also Puckett,* 556 U.S. at 134 (explaining that strict limits on correcting unpreserved error "serve[] to induce the timely raising of claims and objections" before the district court). Thus, the "ultimate question is whether the part[y] 'g[a]ve the District Court the opportunity to consider the argument.'" *Abreu*, 32 F.4th at 275 (second alteration in original) (quoting *Dupree*, 617 F.3d at 731). Nothing about Rule 29 warrants an exception to that reasoning. As elsewhere, requiring a defendant to "specify at trial the particular basis on which acquittal is sought" ensures that "the Government and district court are provided notice" and can address arguments in the first instance. *McDowell*, 498 F.3d at 312; *see also United States v. Kieffer*, 991 F.3d 630, 639 (5th Cir. 2021) (Oldham, J. concurring in the judgement) ("[A] general declaration of 'insufficient evidence!' . . . does nothing to focus the district judge's mind on anything.").

We acknowledge that several of our sister circuits have held (often with little analysis) that a "broadly stated" Rule 29 motion "without specific grounds" preserves the full array of sufficiency challenges for appeal. *United*

20

*States v. Hammoude*, 51 F.3d 288, 291 (D.C. Cir. 1995).[13] But that line of authority rarely offers a justification. So even if "the practice of allowing general Rule 29 objections is well accepted," *Marston*, 694 F.3d at 135, it is unclear why such a practice should carve out an exception to the "ordinar[y]" rule that counsel must "make

---

[13] *See also United States v. Maez,* 960 F.3d 949, 959 (7th Cir. 2020) ("A motion under Rule 29 that makes specific arguments waives issues not presented, but a general motion preserves every objection."); *United States v. Marston*, 694 F.3d 131, 134 (1st Cir. 2012) (quoting *Hammoude* and suggesting that "the same rule applies in this circuit as well"); *United States v. Chance*, 306 F.3d 356, 371 (6th Cir. 2002) (finding that a defendant preserved specific challenges to the sufficiency of the evidence where "his Rule 29 motions were general in nature"); *United States v. Hoy*, 137 F.3d 726, 729 (2d Cir. 1998) (holding that a Rule 29 motion "generally arguing that the government presented insufficient evidence to convict . . . preserve[s] [all] sufficiency claims for appeal"); *cf. United States v. Graf,* 610 F.3d 1148, 1166 (9th Cir. 2010) ("A defendant need not state specific grounds to support a Rule 29 motion . . . however, when a Rule 29 motion is made on a specific ground, other grounds not raised are waived[.]" (citations omitted)).

21

specific objections which state the grounds for or scope of the objection." *Id.*

The Seventh Circuit has offered perhaps the most developed justification for a position contrary to our holding here. It reasons that Rule 29 "does not require specificity" by contrasting it with its civil analogue, which expressly requires that a motion for judgment as a matter of law "specify the judgment sought and the law and facts that entitle the movant to the judgment." *United States v. Hosseini*, 679 F.3d 544, 550 (7th Cir. 2012) (quoting Fed. R. Civ. P. 50(a)(2)). Building on that premise, the Seventh Circuit has explained that "a general [Rule 29] motion preserves every objection" because "parties to a criminal case—unlike civil parties—have no general obligation to support [their] motions with specific reasons." *Maez,* 960 F.3d at 959 & n.6 (citing Fed. R. Crim. P. 47 advisory committee's note to 1944 adoption). We decline to follow that approach for two reasons.

First, while Rule 29 itself is silent on specificity, Rule 47(b) is not: it provides that any motion "must state the grounds on which it is based." Fed. R. Crim. P. 47(b). And in *Joseph* we explained that the terms "ground" and "argument" are "synonymous" in "the degree of specificity they entail." 730 F.3d at 340. Read together, those propositions mean what they say: a motion—including one under Rule 29—must state the arguments on

22

which it rests. "[M]erely raising an *issue* that encompasses the appellate argument is not enough" to preserve it for appeal. *Id.* at 337.

Second, the advisory committee note on which *Maez* relies reaches only so far. It states that Rule 47(b) "does not require that the *grounds* [i.e., arguments] upon which a motion is made shall be stated 'with particularity.'" Fed. R. Crim. P. 47 advisory committee's note to 1944 adoption (emphasis added) (quoting Fed. R. Civ. P. 7(b)(1)). We have never held—and do not hold today—that an *argument* must be fully developed or exhaustively briefed in the district court to be preserved. Indeed, "[p]arties are free . . . to place greater emphasis and more fully explain an argument on appeal than they did in the District Court" or to "even, within the bounds of reason, reframe their argument." *Joseph*, 730 F.3d at 341. But the argument itself must be presented in some form; merely invoking only an overarching "issue," which is "broader in scope," will not suffice. *Id*. at 340.

At all events, those same courts—like ours in *Williams*—also hold that when a defendant chooses to raise specific Rule 29 arguments in the district court, any unraised sufficiency arguments are forfeited or waived.[14]

---

[14] *See Marston*, 694 F.3d at 134 ("[W]hen a defendant chooses only to give specific grounds for a Rule 29

23

That asymmetry is difficult to justify.[15] Indeed, we deemed the *Williams* rule "sensible" precisely because it

---

motion, all grounds not specified are considered waived[.]"); *Chance*, 306 F.3d at 369 ("[W]here the defendant makes a Rule 29 motion on specific grounds, all grounds not specified in the motion are waived."); *Hosseini*, 679 F.3d at 550 ("[A] defendant's choice to raise specific arguments and omit others in a Rule 29 motion has consequences on appeal."); *United States v. Spinner*, 152 F.3d 950, 955 (D.C. Cir. 1998) ("[W]e review an appellant's sufficiency-of-the-evidence challenge for plain error when a motion for judgment of acquittal was based on specific (and different) grounds."); *United States v. Rivera*, 388 F.2d 545, 548 (2d Cir. 1968) ("[W]here as here a motion for acquittal is made on specified grounds . . . we think that [non-specified] objection[s] ha[ve] been waived.").

[15] Only the Second Circuit—more than half a century ago—has offered a rationale for this distinction. *See Rivera,* 388 F.2d at 548. There, the court suggested that when a defendant "moves to acquit without specification" a court "might assume [specific objections] to be included among his unarticulated disagreements." *Id*. By contrast, when a defendant "does specify grounds for the motion and omits mention of [other arguments] we must conclude that he cannot be considered to have raised [them]." *Id*. In other words, a barebones insufficiency motion is deemed

24

"encourages litigants to directly identify for the district court the purported grounds for error." *Johnson,* 19 F.4th at 255. A countervailing rule—treating a generic Rule 29 motion as preserving every later-articulated argument—would invert that incentive, effectively *penalizing* specificity at trial. *See Kieffer,* 991 F.3d at 638 (Oldham, J., concurring in the judgement) (noting that this double standard "encourages defendants to say as little as possible in the district court and to save their good arguments as 'gotchas!' for appeal").[16] That result cannot be reconciled

to embrace every conceivable theory, but the moment a defendant articulates particular grounds, his silence as to any others is treated as waiver. That is a tenuous assumption. It is also difficult to square with traditional preservation principles and the policy bases underlying them.

[16] Even the First Circuit, despite its bottom-line holding, acknowledged this perverse incentive. In *Marston*, the court had to decide whether an "ambiguous [Rule 29] motion" was general or specific, due to the different standards it applies to each. 694 F.3d at 135. Because defendant's counsel first made a "purely [] general objection to the government's evidence" and then followed with "specific objections," it was unclear what standard to apply. *Id*. The court observed that, in such circumstances, there is "good reason" to classify the motion as "general" to avoid "encourag[ing] general

25

with our preservation jurisprudence and turns the adversary process on its head. We therefore extend our *Joseph* precedent and hold that a general Rule 29 motion fails to preserve all specific sufficiency arguments for appellate review.

Applying that rule here, Abrams did not preserve the particular sufficiency arguments he now advances. His Rule 29 motion was as general as they come. The entire colloquy was short:

THE COURT: Now that you are going to rest, are there motions?

> [DEFENSE COUNSEL]: Yes. I move for judgment of acquittal on [R]ule 29[(a)]. I waive argument.
>
> [GOVERNMENT COUNSEL]: Subject to the pending stipulation, there's more than enough evidence in the record to justify all 48

---

objections without examples." *Id.* It further recognized that "penaliz[ing] the giving of examples, which might be understood as abandoning all other grounds, discourages defense counsel from doing so." *Id.* Why that logic should be confined to "examples" appended to an otherwise general motion and not applied to the general/specific distinction more broadly remains unexplained.

counts in the indictment for a myriad of Title 18 offenses.

THE COURT: It's clear that the presentation of evidence so far if believed by the jury would certainly satisfy the government's burden of proof beyond a reasonable doubt, and so the [R]ule 29 motion is denied.

Appx809.

Because Abrams articulated no specific arguments, we review his sufficiency claims only for plain error. *Williams,* 974 F.3d at 361 & n.29 (stating that "plain-error review is appropriate" for unpreserved Rule 29 arguments). That standard requires a showing that (1) there was an "error"; (2) the error was "plain"; (3) the error prejudiced or "affect[ed] substantial rights"; and (4) not correcting the error would "seriously affect[] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732 (1993) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)). An insufficiency claim succeeds under plain-error review only where affirmance would produce "a manifest miscarriage of justice—the record must be devoid of evidence of guilt or the evidence must be so tenuous that a conviction is shocking." *United States v. Burnett,* 773 F.3d 122, 135 (3d Cir. 2014) (citation omitted). Put

27

differently, the defendant must "establish that the trial judge and prosecutor were derelict in even permitting the jury to deliberate." *Id.* That is a high bar, and one that Abrams cannot clear.

## B. Fraud Counts

We begin with the wire and mail fraud counts (Counts 1–19) because reversal of Abrams's convictions on these claims would obviate the need to address the aggravated-identity-theft counts, which depend on fraud as a predicate offense. *See* Op. Br. at 24.[17] For the reasons that follow, we conclude that the record amply supports Abrams's fraud convictions. Accordingly, there is no error under *Olano*'s first prong, and we will affirm those counts and proceed to consider the identity theft counts.

To satisfy the first prong of plain-error review under *Olano*, Abrams must establish that "the record contains no evidence, regardless of how it is weighted," from which a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Walker*, 657 F.3d 160, 171 (3d Cir. 2011) (citations omitted). This is an "extremely high" burden to meet. *United States v. Serafini*, 233 F.3d 758, 770 (3d Cir.

---

[17] Abrams appears to apply each of his arguments to all 19 counts of fraud in the indictment.

2000). Our review is "particularly deferential[:]" we "view the evidence in the light most favorable to the prosecution" and "must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence." *Walker,* 657 F.3d at 171 (citation modified and citations omitted).

Both federal fraud statutes at issue here criminalize "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *See* 18 U.S.C. § 1343 (wire fraud); *id.* § 1341 (mail fraud).[18] The government must prove: "(1) a scheme or artifice to defraud for the purpose of obtaining money or property, (2) participation by the defendant with specific intent to defraud, and (3) use of the mails or wire transmissions in furtherance of the scheme." *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012). Abrams does not dispute that the third element is met, so we focus exclusively on the first two elements. *See* Op. Br. 52–56. Here, the record contains more than sufficient evidence, viewed in the light most favorable to the prosecution, from which a rational trier of fact could

---

[18] Because both statutes contain this identical language, we interpret them "*in pari materia.*" *Porat*, 76 F.4th at 218 n.3 (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005)).

29

have found that both elements were met beyond a reasonable doubt.

### 1. For the purpose of obtaining money or property

The first element of federal fraud requires that "property must play more than some bit part in a scheme: It must be an object of the fraud." *Kelly v. United States*, 590 U.S. 391, 402 (2020) (internal quotation marks and citation omitted). Put differently, "[o]btaining the victim's money or property must have been the 'aim,' not an 'incidental byproduct,' of the defendant's fraud." *Kousisis v. United States*, 605 U.S. 114, 122 (2025) (quoting *Kelly*, 590 U.S. at 402, 404). Abrams does not dispute that his scheme was aimed at obtaining money or property. Instead, he now argues that his conviction fails because "the Government did not allege []or prove that inflicting economic harm on the investors was the object of Abrams's plan." Op. Br. at 54.

Abrams maintains that federal fraud requires not only an intent to obtain money or property, but also an intent to make the victim worse off economically. *Id.* He is wrong. While this case was pending, the Supreme Court squarely rejected that position in *Kousisis*, holding that a defendant may violate § 1343 "regardless of whether he seeks to leave the victim economically worse off." 605 U.S. at 124. *Kousisis* likewise forecloses Abrams's related

30

theory that the investors "received exactly what they paid for"—i.e., "a risky investment tantamount to a lottery ticket." Op. Br. at 54 (first quotation from *Porat*, at 227 (Krause, J., concurring)). Again, economic or pecuniary harm is not required under § 1343, *Kousisis,* 605 U.S. at 124 ("[T]he wire fraud statute . . . does not so much as mention [economic] loss, let alone require it."), and the "benefit-of-the-bargain" line of cases Abrams cites in support have been abrogated by *Kousisis*.[19] Abrams acknowledges as much in his Reply Brief. Rep. Br. at 20 n.4.

Equally unavailing is Abrams's attempt to shift blame to his victims. He contends that they were "sophisticated investors" who "considered EthosGen's financial information unreliable[,]" yet proceeded in spite of that with what they knew was a high-risk investment. Op. Br. at 55. According to Abrams, they did not believe or rely on his alleged lies and misrepresentations— purportedly a "strong indication that no actionable federal criminal fraud occurred." *Id.* at 55–56; *see also* Rep. Br. at 20 (arguing that the investors "entered the relationship with their eyes open and did not rely on any of his alleged misrepresentations"). But "justifiable reliance . . . plainly

---

[19] *See, e.g., United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016); *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015).

31

ha[s] no place in the federal fraud statutes." *Neder v. United States*, 527 U.S. 1, 24–25 (1999) (internal quotation marks and citation omitted); *see also Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 648 (2008) ("Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud . . . even if no one relied on any misrepresentation."). And to the extent the investors knowingly "signed off on an investment that involved a high degree of risk," that simply repackages the already-rejected "benefit-of-the-bargain" theory. Op. Br. at 55–56 (citation modified).[20] Accordingly, Abrams's challenge to the "money or property" element fails. We turn, then, to the next question: whether a reasonable jury could infer from the evidence presented, the requisite intent to defraud. We conclude that it could.

## 2. Specific intent to defraud

We have long recognized that "[j]uries may infer a defendant's intent to defraud from circumstantial

---

[20] To the extent that Abrams argues that the investors were negligent in ignoring the many red flags surrounding EthosGen, we "reject the relevance of those allegations, even if true." *United States v. Coyle,* 63 F.3d 1239, 1244 (3d Cir. 1995). "The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct." *Id.* (citation omitted).

32

evidence." *United States v. Cammarata,* 145 F.4th 345, 367 (3d Cir. 2025) (citation omitted). Such inferences need only bear a "logical or convincing connection to established fact." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 425 (3d Cir. 2013). And even where the evidence "may be consistent with multiple possibilities," our role "is to uphold the jury verdict . . . as long as it passes the 'bare rationality' test." *Id.* at 432.

Abrams frames his "entire defense" as a claim of honest belief—namely, that "due to the nature of his personal and business relationships," he believed he "had implied consent to substitute his and EthosGen's name for other persons'/entities' names on documents." Rep. Br. at 20. The jury rejected that defense, returning guilty verdicts on all nineteen fraud counts. We may not disturb that determination unless the record is entirely "devoid of evidence" from which fraudulent intent could be inferred. *Burnett,* 773 F.3d at 135. That by no means describes the condition of the record that is before us.

The evidence admitted at trial amply supplies the "logical or convincing connection" required to support the jury's verdict. *Caraballo-Rodriguez*, 726 F.3d at 425. Abrams altered business contracts, adding EthosGen where it was not a signatory or excising references to other contracting entities. He also inflated EthosGen's financials

33

to enhance its appearance to investors.[21] He further misrepresented that the first two units funded by the initial tranche had been sold and installed when they had not. That representation aligned with a condition for receiving the second tranche. No evidence remotely suggests that Abrams possessed "implied consent" to take those steps or that he had a non-fraudulent purpose for doing so.

His handling of investor funds points in the same direction. Shortly after he received the money from investors, Abrams withdrew and distributed it among four other business accounts "within the span of approximately 32 minutes." Appx715. He then used funds to purchase a personal residence while telling investors the funds were used "to secure unit inventory." Appx450, 716. Although Abrams characterized the transfers as a "mistake" and claimed the residence had business purposes, Appx720–721, 756, an IRS agent who testified opined that the pattern resembled money laundering. The jury was entitled to credit that testimony. *See Walker,* 657 F.3d at 171 (stating that courts may not "usurp the role of the jury

---

[21] Abrams himself acknowledges this. *See* Op. Br. at 8–9 ("Abrams provided information and EthosGen documents that were not accurate—he inflated EthosGen's cash-on-hand, revenue stream, number of units/engines successfully sold/installed and paid for . . . and intellectual property portfolio.").

by weighing credibility and assigning weight to the evidence" (citations omitted)).

On this record—much of which was not factually contested at trial—a rational jury could find that Abrams acted with intent to defraud, as shown by his repeated misrepresentations and his handling of investor funds. Because we discern no error under *Olano*'s first prong, the fraud convictions must stand. We turn next to *Dubin* and the aggravated-identity-theft counts.

## C. Aggravated-Identity-Theft Counts

In addition to the fraud counts, the jury returned guilty verdicts on five counts of aggravated-identity-theft, 18 U.S.C. § 1028A. Those convictions carry a mandatory two-year term to run consecutively to any term of imprisonment imposed on the underlying offense. *See* § 1028A(a)(1).[22] On appeal, Abrams devotes the lion's share

---

[22] Abrams was sentenced to an additional two-year term for each count, with all § 1028A sentences to run "concurrently with each other." Appx5. Thus, vacating fewer than all counts would not affect Abrams's aggregate term of imprisonment. However, we must still analyze each count separately. Under the "concurrent sentence doctrine," courts have "discretion to avoid resolution of legal issues affecting less than all of the counts in an

35

of his briefing to arguing that the evidence does not satisfy the standard announced in *Dubin,* 599 U.S. at 131.[23] We disagree. As explained below, all of Abrams's § 1028A convictions are supported by sufficient evidence under *Dubin*. Accordingly, there is no error under *Olano*.

---

indictment where at least one count will survive and the sentences on all counts are concurrent." *Clark v. United States*, 76 F.4th 206, 209 n.2 (3d Cir. 2023) (citation omitted). That doctrine will not apply, however, where, as here, the district court imposes a special assessment for each count of conviction, as required by 18 U.S.C. § 3013. *See United States v. Ross,* 801 F.3d 374, 382 (3d Cir. 2015) (explaining that in such cases "the sentences are not concurrent, and the 'concurrent sentence' doctrine cannot be used to avoid appellate review of each count of conviction") (citing *Ray v. United States,* 481 U.S. 736, 737 (1987)); *see also Ryan v. United States,* 688 F.3d 845, 849 (7th Cir. 2012) ("As a practical matter, the concurrent-sentence doctrine was abrogated for direct appeal when Congress imposed a special assessment of $50 (now $100) for each separate felony conviction.").

[23] The Supreme Court issued *Dubin* on June 8, 2023, soon after Abrams's trial commenced. 599 U.S. 110. But Abrams never invoked *Dubin* at trial, even though its "guidance was available . . . before the Government's first witness even finished testifying." Op. Br. at 31.

### 1. Applicable legal standard under *Dubin*

Section 1028A(a)(1) imposes a mandatory two-year additional sentence when a defendant "during and in relation to any [predicate offense], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person."[24] The statute requires the Government to prove four distinct elements: (1) the defendant knowingly transferred, possessed, or used; (2) a means of identification of another person; (3) without lawful authority; and (4) the defendant did so during and in relation to a predicate crime. *See, e.g., United States v. Pierre*, 825 F.3d 1183, 1194 (11th Cir. 2016). Abrams contests only the fourth element. *See* Op. Br. at 27–49.

The Supreme Court has recently clarified what it means to "use" another person's means of identification "in relation to" a predicate offense. In *Dubin*, the Court held that a defendant does so only "when th[e] use is at the crux of what makes the [defendant's] conduct criminal." 599 U.S. at 131. Being at the "crux" requires that the identifying information be a "key mover in the criminality," *id.* at 123, not merely connected to the offense by "a causal relationship, such as facilitation of the offense or being a but-for cause of its success." *Id*. at 131

---

[24] Predicate offenses include both wire and mail fraud. *See* § 1028A(c)(5).

(internal quotation marks and citation omitted). For fraud and deceit offenses, the identifying information must be used in a "fraudulent or deceptive" manner that typically goes to "'who' is involved," not simply "*how*" or "*when*" the conduct occurred. *Id.* at 132. Thus the Court contrasted routine overbilling scenarios— "[a] lawyer who rounds up her hours from 2.9 to 3," "a waiter who serves flank steak but charges for filet mignon," or "an ambulance service that actually transported patients but inflated the number of miles driven"—where the identifying information is "ancillary to what ma[kes] the conduct fraudulent," with conduct like the "pharmacist who swipes information from the pharmacy's files and uses it to open a bank account in a patient's name," where the misuse of identity is "integral to" the fraud itself. *Id*. at 114, 117–18 (citation omitted).

In *Dubin*, the defendant was convicted of healthcare fraud and aggravated-identity-theft after his company submitted inflated claims to Medicaid, falsely claiming that services rendered to an actual patient were performed by a psychologist rather than by a psychological associate. *Id.* at 114–15. Although the claims included legitimate patient identifiers (name and Medicaid number), the scheme's core deceit concerned "*how* and *when* services were provided, . . . not *who* received the services." *Id.* at 132. The Court vacated the defendant's aggravated-identity-theft convictions because the patient's identifying information was merely an "ancillary feature" of the

38

billing and "not at the crux of what made the underlying overbilling fraudulent." *Id.*

Abrams reads *Dubin* to require vacatur of his aggravated-identity-theft convictions. As a preliminary matter, he argues that § 1028A(a)(1) now demands proof of pecuniary or reputational harm—what he labels "Judge Easterbrook's heuristic." Op. Br. at 31–35. He derives that view from a Seventh Circuit opinion, *United States v. Spears*, 729 F.3d 753 (7th Cir. 2013), which he contends *Dubin* "cite[d] . . . with approval." Op. Br. 31–32; Rep. Br. at 3–4. Abrams's reading is, to put it kindly, a stretch. *Dubin* cites *Spears* only to observe that some lower courts had adopted "more restrained readings" of § 1028A. *Dubin,* 599 U.S. at 116 & n.2. *Dubin* neither mentioned a harm requirement nor adopted *Spears*'s reasoning. And *Spears* itself addressed how to apply a separate aspect of the § 1029A analysis—the "another person" element—in a scenario where the defendant used identifying information with the subject's consent, noting only in passing that "[t]he usual victim of identity theft *may* be out of pocket . . . or *may* be put to the task of rehabilitating a damaged reputation." *Id.* at 755, 757 (emphasis added).

At all events, even if we were inclined to entertain Abrams's novel requirement, we decline to do so here under plain-error review. Our Court has never endorsed a harm element under § 1028A, and Abrams identifies no

39

authority that clearly does so. Thus, any error in this respect—assuming one exists—is hardly "clear or obvious" as our precedent requires. *United States v. Dorsey*, 105 F.4th 526, 530 (3d Cir. 2024) (explaining that an error is plain when "the state of the law" demonstrates that "the underlying legal proposition is not subject to reasonable dispute" (internal quotations and citation omitted)). We therefore set the proposed harm requirement aside and ask whether—viewing the evidence "in the light most favorable to the prosecution"—a reasonable jury could find that Abrams's use of another's identifying information was at the "crux" of his fraud. *Walker*, 657 F.3d at 171. The trial record supports such a finding on each count.

## 2. Counts 20–22

For Counts 20–22, the "crux" of Abrams's fraud was in submitting falsified documents to deceive investors into believing that EthosGen was far more financially stable and operationally successful than it really was, thereby inducing them to invest. Central to that fraud was "who" attested to the representations in the documents, as they would have carried no weight without such endorsements.

First, to mislead investors into thinking the company had generated revenue that it had not, Abrams

40

altered EthosGen's 2010 tax return to appear that it was a 2016 return. In doing so, he inserted the name and tax preparer number of an accountant, John Riccetti, without having obtained the accountant's consent. Second, Abrams forged a contract between PNNL and Rockwell Collins, altering it to appear as if it was a contract between PNNL and EthosGen, falsely using the name and signature of PNNL representative Kevin Ghirardo. Third, Abrams misrepresented that EthosGen possessed intellectual property rights that it, in fact, did not. He did so by altering a patent-license agreement between Battelle and Innaventure, making it appear as if the agreement was between Battelle and EthosGen and using the name and signature of Battelle representative Peter Christensen. In each of these instances, Abrams's use of Ricetti's, Ghirardo's, and Christensen's means of identification was itself "fraudulent or deceptive," because it falsely implied that those individuals had endorsed the altered documents. *Dubin*, 599 U.S. at 132. That is, the deceit concerned *who* had purportedly prepared the 2016 tax return or ratified the contracts that favored EthosGen. Thus, Abrams's deceitful conduct falls cleanly within § 1028A and the framework established by *Dubin*.

### 3. Counts 23–24

Abrams's challenge to Counts 23 and 24 fails for similar reasons. In order for KSTI to release the second

$200,000 tranche of investment funds, EthosGen was required to show that it had (1) successfully sold, installed, and commissioned units at two customer sites; (2) finalized a manufacturing and pricing agreement with Rockwell Collins for roughly 50 units; and (3) hired a CFO. Attempting to satisfy the first condition, Abrams told investors that EthosGen had completed a "successful install in United Kingdom in May." Op. Br. at 18; Appx450–451. That was false. The unit had not been installed even by November 2018, and when installation finally did occur, the unit failed and had to be "uninstalled and returned." Appx528–29. In an attempt to validate his false claim, Abrams emailed a purported commissioning checklist for "M.G.H. Limited" on August 1, 2018, bearing the name and signature of Michael Harris, M.G.H.'s managing partner. In fact, Harris had neither signed the document nor had he authorized anyone to sign on his behalf. Abrams had also forged Michael Mastergeorge's signature on a purported manufacturing agreement between EthosGen and Rockwell Collins. Relying on Abrams's representations that the required conditions had been met, the investors released the second tranche. Op. Br. at 18–19.

Based on the foregoing facts, a rational jury could reasonably conclude that the forged signatures of Harris and Mastergeorge were the "key mover[s] in [Abrams's] criminality." *Dubin*, 599 U.S. at 123. The forged

42

signatures converted what were otherwise meaningless documents into apparent third-party attestations that the requirements for additional funding had been met. Thus, unlike the "ancillary feature of the billing method" at issue in *Dubin*, Abrams's misuses of Harris's and Mastergeorge's means of identification were the metaphorical keys that unlocked the cash drawer. *Id*. at 132. The fraudulent use of those names and signatures went to "who" was vouching for completion of the conditions, and as such, was itself "fraudulent or deceptive." *Id.*

The Ninth Circuit's decision in *United States v. Parviz* offers a useful illustration. 131 F.4th 966 (9th Cir. 2025). In that case, the defendant obtained her child's passport by submitting a forged "medical exception" letter bearing the signature of a medical provider to bypass a requirement that the child appear in person. *Id*. at 968. Although the provider "knew [the defendant] inten[ded] to submit a letter from him in support of her attempt to get a passport" and had discussed with her "some of the things that she might say," he neither authored the letter nor authorized its use. *Id*. at 971–72 (internal quotation marks omitted). The passport examiner approved the application based on the letter, signed by someone who "held himself out to be a medical provider." *Id*. at 971. The court held that the use of the provider's signature was "central to the fraudulent letter's objective of establishing a medical

43

excuse" and, therefore, at the "crux" of the offense because the deception went to "'who' was making the false representations in the letter." *Id*. at 971–72

So too in the matter before us. Abrams forged the signatures of Harris and Mastergeorge on the commissioning checklist and manufacturing agreement, respectively, in an effort to secure the second tranche of funding. Although EthosGen might have had some limited relationship with M.G.H. at that time, no unit had been installed—let alone "successfully" installed—when Abrams sent the checklist. Likewise, while EthosGen had a business relationship with Rockwell Collins through the teaming agreement, that relationship alone did not fulfill the formal requirement for a manufacturing agreement, which KSTI required before releasing the second tranche. In fact, Mastergeorge explicitly declined to sign a nearly identical agreement, stating that "[t]he business wasn't big enough to justify it." Appx532. Investors released funds in reliance on both documents, which appeared to bear the signatures of individuals who possessed the authority to validate their authenticity. A rational jury could thus conclude that Harris's and Mastergeorge's signatures were "central to the [checklist's/agreement's] objective" of proving that the conditions for additional funding had been met. *Parviz*, 131 F.4th at 971. Accordingly, Abrams's conduct falls squarely within *Dubin*'s "crux" formulation

44

because the fraud turned on "'who' was making the false representations in the [checklist/agreement]." *Id.* at 972.

In sum, the evidence supports the jury's finding that Abrams used—at the crux of his fraud—the means of identification of another in a deceptive manner, satisfying the government's burden on all counts. We will therefore affirm.

## III. Alternative aggravated-identity-theft arguments

Setting sufficiency aside, Abrams presses two fallback challenges to his § 1028A convictions. First, he contends that the district court plainly erred by failing to instruct the jury on *Dubin*'s "crux" holding. Op. Br. at 46–49. Second, he argues that § 1028A is unconstitutionally vague even as construed in *Dubin*. *Id.* at 49–51. Abrams failed to raise either objection at trial, so we review for plain error. *See United States v. Stevens*, 70 F.4th 653, 656 (3d Cir. 2023). Under that standard, his first argument fails because any instructional omission in this instance was not "plain," and his second argument is foreclosed by *Dubin* itself.

## A. "Crux" jury instruction.

As relevant here, the District Court instructed the jury that "[i]n order to find the defendant guilty of identity theft," the government had to prove beyond a reasonable

45

doubt that "the defendant used or transferred or possessed the means of identification [of another person] during and in relation to the offenses of wire fraud charged in counts one through 18 or mail fraud charged in count 19." Appx832–33. Abrams maintains the charge was deficient because the instruction as to the "use" and "in relation to" elements of the offense did not explain *Dubin*'s "crux" requirement. Op. Br. at 46. Although a district court's "omission of an essential element of an offense in a jury instruction ordinarily constitutes plain error," *United States v. Haywood*, 363 F.3d 200, 207 (3d Cir. 2004) (citation modified and citation omitted), whether *Dubin*'s "crux" refinement is itself an "essential element" of § 1028A is not plain. Accordingly, Abrams's claim fails under *Olano*'s second prong.

An error is "plain" only if it is "clear or obvious" in light of "the state of the law while the case under review is on appeal." *Dorsey*, 105 F.4th at 530.[25] To be sure, "the

---

[25] Accordingly, while multiple cases cited by the parties were decided after Abrams's trial had concluded, these cases are still relevant to our analysis. *See also Henderson v. United States*, 568 U.S. 266, 273–74 (2013) (explaining that an error may be plain "even if the trial judge's decision was plainly *correct* at the time when it was made but subsequently becomes incorrect based on a change in law").

46

lack of in-circuit case law on the specific question does not doom a finding of plain error . . . so long as the Courts of Appeals that have addressed the question have uniformly" adopted an appellant's position. *United States v. Scott*, 14 F.4th 190, 198 (3d Cir. 2021) (citation modified and citations omitted). But even unanimity among a few circuits may not suffice. *See, e.g., United States v. Smith,* 751 F.3d 107, 119 n.10 (3d Cir. 2014) (declining to reverse for plain error where our Court had not reached the issue, but three circuits had sided with the appellant). Here, our survey of the field reveals neither clarity nor obviousness.

*Dubin* did not explicitly add a new element to § 1028A, nor did it mandate a "crux" instruction in every case. And our Court has yet to address in a precedential opinion whether *Dubin* requires such an instruction.[26] So

---

[26] Recently, in a nonprecedential opinion, a different panel of this Court found no error, plain or otherwise, where a district court provided instructions that were nearly identical to what the District Court provided here. *See United States v. Weigand,* No. 23-2159, 2025 WL 1554931, at *2 (3d Cir. June 2, 2025) (finding no error where "the District Court instructed the jury that [the defendant] could only be found guilty of aggravated identity theft if he 'used or possessed the means of identification during and in relation to' the wire fraud offenses"); ECF No. 65 (28(j) letter discussing *Weigand*).

47

we must look to our sister circuits to determine if "the great weight of persuasive authority supports" requiring a specific "crux" jury instruction. *Scott*, 14 F.4th at 198 (citation modified and citation omitted). It does not.

The two circuits to have squarely confronted the issue are split. The Ninth Circuit held that an instruction tracking only § 1028A's statutory text was inadequate "[g]iven the indeterminacy of the phrase 'in relation to'" and *Dubin*'s "adoption of a 'narrower reading.'" *United States v. Ovsepian*, 113 F.4th 1193, 1209 (9th Cir. 2024).[27] The Fourth Circuit has taken the opposite view, concluding that a separate "crux" instruction is not required because *Dubin* "did not alter our understanding of the elements of the aggravated-identity-theft offense or require *additional* factual findings in each prosecution."

---

While that opinion is nonprecedential, it adds further support to the conclusion that it is not "clear or obvious" that a "crux" jury instruction is necessary.

[27] Importantly, *Ovsepian* did not involve plain error review. That case involved a motion for relief under 28 U.S.C. § 2255, and although the defendant "procedurally defaulted" on his *Dubin* argument by failing to raise it on direct appeal, he was able to revive it for full consideration "by demonstrating actual innocence." *Id.* at 1200.

*United States v. Jackson,* 126 F.4th 847, 868 (4th Cir. 2025).

The other decisions Abrams cites are not directly on point. In *United States v. Gladden*, the Eleventh Circuit rejected a jury instruction that expressly suggested "that mere facilitation of the predicate offense is sufficient to support a conviction"—a proposition that *Dubin* plainly forbids. 78 F.4th 1232, 1248 (11th Cir. 2023); *see Dubin*, 599 U.S. at 131 ("[B]eing at the crux of the criminality requires more than a causal relationship, such as 'facilitation' of the offense[.]" (citation omitted)). Likewise, the Second Circuit held that a jury instruction was "plainly incorrect" where it provided that the "in relation to" element could be satisfied "merely by showing that the means of identification had 'a purpose, role, or effect with respect to the crime'"—a formulation that directly conflicts with *Dubin*. *United States v. Omotayo*, 132 F.4th 181, 196 (2d Cir. 2025) (citation omitted).

In short, whatever *Dubin* may ultimately require in future cases,[28] the absence of controlling Third Circuit

---

[28] Notably, judicial committees in at least two circuits have updated their model jury instructions for aggravated-identity-theft to reflect *Dubin*'s "crux" requirement. *See* Manual of Model Criminal Jury Instructions for the District Courts of the Ninth Circuit § 15.9 (2022 ed.,

authority and the split among our sister circuits means that any instructional omission here was not plain. *See United States v. Cruz,* 757 F.3d 372, 387 n.11 (3d Cir. 2014) (noting that "there could be no plain error" where "we have yet to decide" the issue and "[o]ther circuit courts are split" (citation omitted)).

## B. Void for vagueness

updated June. 2025) ("A means of identification is [transferred, possessed, or used] 'during and in relation to' a crime when the means of identification is [transferred, possessed, or used] in a manner that is fraudulent or deceptive and is at the crux of what makes the conduct criminal."); Fifth Circuit Pattern Jury Instructions (Criminal Cases) § 2.48C (2024) ("Identity theft is committed when a defendant uses the means of identification itself in a manner to defraud or deceive. It is not enough to be a violation of this law that the use of a means of identification was helpful or even necessary to accomplish the charged conduct unless the accused used that means of identification to deceive about the identity of the person performing the actions or receiving the benefits or services."). We consider it unnecessary to opine as to whether or not either circuit committee's formulation is appropriate.

50

Abrams's vagueness challenge is dead on arrival. He leans entirely on Justice Gorsuch's concurrence in *Dubin*, which would deem § 1028A unconstitutionally vague. *See Dubin*, 599 U.S. at 133–39 (Gorsuch, J., concurring). But the majority explicitly rejected that view, emphasizing that "[t]he concurrence's bewilderment is not, fortunately, the standard for striking down an Act of Congress as unconstitutionally vague." *Id*. at 132 n.10. Consistent with *Dubin*'s holding, multiple courts have since declined to find § 1028A unconstitutional. *See Gladden*, 78 F.4th at 1247 ("Under [*Dubin*'s] guidance, we decline to find that Section 1028A is unconstitutionally vague."); *United States v. Iannelli*, 700 F. Supp. 3d 1, 4 (D. Mass. 2023) ("[T]he *Dubin* Court cast significant doubt on future void-for-vagueness challenges to 18 U.S.C. § 1028A(a)(1).").[29] We do likewise.

In sum, neither of Abrams's alternative arguments has merit. We therefore will affirm the § 1028A convictions.

---

[29] Albeit in a nonprecedential opinion, we recently rejected an identical void-for-vagueness challenge to § 1028A(a)(1) in light of *Dubin*. *United States v. Diarra*, No. 22-3232, 2025 WL 1862994, at *2 n.4 (3d Cir. July 7, 2025).

## IV. Good Faith defense

At trial, Abrams requested an instruction that the jury could not find him guilty of wire or mail fraud if it found that he acted in "good faith"—that is, he had "an honestly-held belief . . . that by virtue of this relationships with others, he had believed he could substitute his name or the name of Ethosgen for the actual party" on documents. Appx165–67; Op. Br. at 57. The District Court declined to give the instruction. Appx825.

We review the refusal to give a requested jury instruction for abuse of discretion. *United States v. Leahy*, 445 F.3d 634, 642 (3d Cir. 2006), *abrogated on other grounds by Loughrin v. United States*, 573 U.S. 351 (2014). We ask (1) "whether the proffered instruction was legally correct," (2) "whether it was not substantially covered by other instructions," and (3) "whether its omission prejudiced the defendant." *United States v. Gross*, 961 F.2d 1097, 1101 (3d Cir. 1992). Because the District Court's *mens rea* instructions for fraud already covered the substance of the proposed charge, we need not reach the issues of legal correctness or prejudice. We will therefore affirm.

A district court does not abuse its discretion by refusing to give a good faith instruction "where the instructions given already contain a specific statement of

the government's burden to prove the elements of a 'knowledge' crime." *Leahy,* 445 F.3d at 651 (citing *Gross,* 961 F.2d at 1102–03). The reason is straightforward: "If the jury found that the Defendant[ ] had acted in good faith, it necessarily could not have found that the Defendant[ ] had acted with the requisite scienter." *Id.* Thus, where the government must prove that a defendant acted "knowingly and willfully" and the court so instructs, a separate "good faith instruction [is] simply a reiteration that the government must carry its burden." *Gross*, 961 F.2d at 1103.[30]

Here, the jury convicted Abrams of eighteen counts of Wire Fraud, 18 U.S.C. § 1343, and one count of Mail Fraud, *id.* at § 1341. Both offenses require knowledge and

---

[30] Abrams's request for the jury instruction itself treats the good faith defense and the intent element for fraud as two sides of the same coin. *See* Appx166 ("Good faith is a defense because it is inconsistent with the requirement of the offenses charged, that James Abrams acted with the intent to defraud or knowingly[.]"); *id.* ("*[I]f* James Abrams made an honest mistake or had an honest misunderstanding about his ability to substitute his name or the name of Ethosgen for others, *then* he did not act with the intent to defraud or knowingly." (emphases added)).

53

an intent to defraud.[31] Consistent with those elements, the District Court instructed the jury that it could convict only if it found that Abrams "knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises or willfully participated in such a scheme with knowledge of its fraudulent nature" and that he "acted with the intent to defraud." Appx830–31. The Court went on to define "intent to defraud" as acting "knowingly and with intention or purpose to deceive or to cheat" and told jurors that they "may consider among other things whether [Abrams] acted with a desire or purpose to bring about some gain or benefit to himself or someone else or with a desire or purpose to cause some loss to someone." Appx832.

With the jury having been so instructed, a stand-alone good-faith instruction "would have been unnecessary and duplicative." *Leahy*, 445 F.3d at 651–52.

---

[31] *See Cammarata*, 145 F.4th at 367 ("To prove wire fraud, the Government [must] show that [a] defendant willfully participated in a scheme or artifice to defraud, with intent to defraud." (citation modified)); *United States v. Bryant*, 655 F.3d 232, 240 (3d Cir. 2011) ("To prove mail fraud, the government must establish (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud").

54

The District Court therefore did not abuse its discretion by refusing Abrams's request.

## V. Restitution

In its May 15, 2024 Judgment, the District Court ordered Abrams to pay $1.1 million in restitution to four EthosGen investors under the MVRA. On October 11, 2024, the Court amended that judgment to include attorneys' fees "directly and proximately caused by [Abrams's] crimes," invoking § 3663A(b)(4). Appx13. Abrams appeals only the amended judgment, arguing first that attorneys' fees are categorically unrecoverable under § 3663A(b)(4) and, alternatively, that many of the fees awarded were not "necessary." Op. Br. at 61–69.

We review restitution orders under "a bifurcated standard: plenary review as to whether restitution is permitted by law, and abuse of discretion as to the appropriateness of the particular award." *United States v. Quillen*, 335 F.3d 219, 221 (3d Cir. 2003) (quoting *United States v. Simmonds*, 235 F.3d 826, 829 (3d Cir. 2000)). Because we hold that attorneys' fees are not recoverable under 18 U.S.C. § 3663A(b)(4), we will vacate the October 11, 2024 order and need not reach Abrams's alternative challenge.

Enacted in 1996, the MVRA requires defendants convicted of certain offenses to pay restitution to their

55

victims. *Simmonds,* 235 F.3d at 830. The statute builds on the Victim and Witness Protection Act of 1982 ("VWPA"),[32] which first authorized federal courts to order restitution as part of a criminal sentence outside the probation context. *See* S. Rep. No. 97–532, at 30 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 2515, 2536. Under the VWPA, restitution is discretionary and may take account of "the amount of the loss sustained by each victim" and "the financial resources of the defendant." 18 U.S.C. § 3663(a)(1)(B)(i). By contrast, the MVRA makes restitution mandatory for specified crimes. *See* 18 U.S.C. § 3663A(a)(1).

The MVRA's reach is broad. It applies, among other things, to any fraud offense "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." *Id.* § 3663A(c)(1)(B). A "victim" includes any person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). Once victims are identified, the court "shall order restitution to each victim in the full amount of each victim's losses." 18 U.S.C. § 3664(f)(1)(A); § 3663A(d). Here, the Government sought—and the District Court awarded—restitution for legal expenses incurred by the investors under § 3663A(b)(4). That subsection requires a defendant

---

[32] Pub. L. No. 97–291, 96 Stat. 1248 (1982).

"in any case" to "reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4).

Abrams does not dispute that his offenses fall within the MVRA, that the fee-seeking entities are "victims," or that the challenged expenses were "incurred during participation in the investigation or prosecution of the offense" or in attending related proceedings. *See* Op. Br. at 60–65. He argues instead that § 3663A(b)(4)'s residual phrase—"other expenses"—cannot, as a matter of law, encompass attorneys' fees, particularly in light of *Lagos v. United States*, 584 U.S. 577 (2018). Op. Br. at 61–65. We agree. The plain text and context of § 3663A(b)(4) do not authorize restitution for attorneys' fees.

"As with any question of statutory interpretation, we must begin with the statutory text." *Khan v. Att'y Gen.*, 979 F.3d 193, 197 (3d Cir. 2020) (internal quotation marks and citation omitted). Standing alone, the phrase "other expenses," is—literally—"capacious enough to include attorney's fees." *Peter v. Nantkwest, Inc.*, 589 U.S. 23, 30–31 (2019) (collecting dictionary definitions and noting that the word "expenses," in isolation, "encompasses wide-ranging" outlays). But the phrase does not appear in isolation. It follows a set of concrete examples: "lost

57

income," "child care," and "transportation." 18 U.S.C. § 3663A(b)(4). So in interpreting "other expenses," we must consider the context in which it appears, as well as its "place in the overall statutory scheme." *United States v. Andrews,* 12 F.4th 255, 261 (3d Cir. 2021) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014)); *see also Peter*, 589 U.S. at 31 (construing "expenses" "alongside neighboring words in the statute").

That is precisely what the Supreme Court did in *Lagos*. There, the Court construed the latter clause of § 3663A(b)(4)—which limits recovery to expenses "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense"—to apply only to "government investigations and criminal proceedings," not private investigations or civil proceedings. *Lagos* 584 U.S. at 579. The Court arrived at that conclusion by examining "both [the MVRA's] individual words and the text taken as a whole." *Id.* at 581. Because the terms "investigation" and "prosecution" are "directly linked," the Court explained, they likely are "of the same general type." *Id*. And since "prosecution" denotes a government criminal prosecution, the pairing persuaded the Court that "investigation" likewise refers to a government criminal investigation. *Id*. By the same logic, "proceedings" means criminal proceedings, not proceedings of any sort, including the bankruptcy proceeding at issue there. *Id*.

58

In support of its interpretation, the Court also invoked the canon of *noscitur a sociis*—"the well-worn Latin phrase that tells us that statutory words are often known by the company they keep." *Id*. at 582. It observed that "lost income," "child care," and "transportation" reflect the ordinary out-of-pocket costs a victim "would be likely to incur when he or she . . . misses work and travels to talk to government investigators, to participate in a government criminal investigation, or to testify before a grand jury or attend a criminal trial." *Id*. By contrast, "the statute says nothing" about expenses typical of private investigations or noncriminal proceedings, such as "hiring private investigators, *attorneys*, or accountants." *Id*. (emphasis added). From that contrast, the Court took further support for its narrow reading, finding "company that suggests limitation and the absence of company that suggests breadth." *Id*. Although *Lagos* did not squarely address whether victims may recover attorneys' fees incurred incident to the government's own investigation or prosecution, its reasoning applies with equal force here. [33]

Legal fees are fundamentally different from the modest, attendance-related expenses enumerated in §

[33] The Court also left open whether § 3663A(b)(4) would cover attorneys' fees "incurred during a private investigation that was pursued at a government's invitation or request." *Id*. at 585.

3663A(b)(4), both in nature and in scale. Unlike lost wages, child care, or transportation—which relate to a victim's ability to be present at investigative or court proceedings—legal fees are charged for professional advocacy and strategic advice, entail specialized expertise, and need not be tethered to a victim's time or travel. The listed items are also the sort of incidental expenditures one would expect to ordinarily total in the hundreds of dollars, or occasionally in the thousands. Legal fees, by contrast, are often orders of magnitude higher. That is the case here—where the fees awarded were nearly $100,000—and in other cases cited by the Government. *See, e.g., United States v. Afriyie,* 27 F.4th 161, 165 (2d Cir. 2022) ($511,368.92 in restitution for legal fees); *United States v. Chan*, 981 F.3d 39, 65 (1st Cir. 2020) ($170,476.36 in restitution for legal fees). It would be unusual, to say the least, for Congress to smuggle so substantial a category of liability into a residual phrase appended to a subsection that is already ancillary to § 3663A(b)'s primary, offense-specific restitution provisions.[34] Reading "other expenses"

---

[34] Section 3663A(b) sets out offense-specific restitution first, then a catchall. Subsection (b)(1) addresses property offenses and provides for the return of property or its value; (b)(2) addresses bodily injury and provides for medical, therapy and rehabilitation expenses, plus lost income; (b)(3) addresses death and provides for funeral and related expenses. Then comes (b)(4), which applies in

to encompass legal fees would be to "ascrib[e] to [it] a meaning so broad that it is inconsistent with its accompanying words"—precisely what *noscitur a sociis* counsels against. *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575 (1995).

The related canon of *ejusdem generis* points the same way. It instructs that "a general or collective term at the end of a list of specific items" is ordinarily "controlled and defined by reference to [those] specific classes . . . that precede it." *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022) (internal quotation marks and citations omitted). So understood, "other expenses" is confined to expenses of the same or similar nature as "lost income," "child care," and "transportation." *See United States v. Koutsostamatis,* 956 F.3d 301, 308 (5th Cir. 2020) (reading § 3663A(b)(4) to mean "lost income and necessary child care, transportation, and other [similar] expenses" (alteration in original)). Legal fees do not fit that mold: they are not attendance-related expenses and "there is no textually sound reason to suppose the final catchall term should bear such a radically different object than all its

---

"any case" and authorizes reimbursement of incidental participation costs—lost income, child care, transportation, and like "other expenses." 18 U.S.C. § 3663A(b)(1)–(4).

61

predecessors." *Id.* at 308 (quoting *Epic Sys. Corp. v. Lewis,* 584 U.S. 497, 513 (2018)).

Moreover, the MVRA expressly authorizes, elsewhere in its text, reimbursement for defined professional services a crime victim might need—"necessary medical and related professional services," "necessary physical and occupational therapy and rehabilitation," and "necessary funeral and related services." *See* § 3663A(b)(2) and (3). By contrast, the statute "says nothing" about attorneys' fees—regardless of the forum in which they are incurred. *Lagos*, 584 U.S. at 582. That omission, set against Congress's specific inclusions of other professional services, is telling. *See United States v. Nasir,* 17 F.4th 459, 472 (3d Cir. 2021) ("*[E]xpressio unius est exclusio alterius*: the expression of one thing is the exclusion of the other.") (en banc).[35]

---

[35] The canon *expressio unius est exclusio alterius* applies where it is "fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). Given the commonplace use of attorneys in legal matters, it is reasonable to presume that Congress was aware that crime victims might incur legal expenses in participating in a prosecution yet chose not to list attorneys' fees among the enumerated professional services. It would be beyond

Surprisingly, the Government acknowledges these textual arguments yet offers no textual arguments to the contrary. Resp. Br. at 55 (recognizing that "Abrams discusses the text of the MVRA at length"). Instead, it faults Abrams for not citing a decision "from this or any court holding that the MVRA does not permit the recovery of attorneys' fees." *Id*. But even if Abrams had cited decisions from other circuits, we would not be bound to follow them. And as the Government concedes, our Court "has not addressed the issue directly."[36] Resp. Br. at 54. That means the text of the statute is the whole ball game.

---

paradoxical for Congress to go to the trouble of explicitly and delicately outlining particular professional services that are compensable, only to then sweep in the entire universe of unspecified professional services via a two-word residual clause.

[36] Two district courts within our Circuit (in addition to the decision we are reviewing here) have held that recovery for attorneys' fees is permitted under § 3663(A)(b)(4). *See, e.g., United States v. Evans,* No. 3-19, 2023 WL 7221350, at *4 (M.D. Pa. Nov. 2, 2023) (holding that a victim under the MVRA was "entitled to restitution including legal fees it incurred during the government's investigation into Defendant's criminal conduct."); *United States v. Dodd,* 978 F. Supp. 2d 404, 422 (M.D. Pa. 2013) (rejecting "a bright-line rule prohibiting restitution for attorneys' fees").

*See United States v. Sherman,* 150 F.3d 306, 313 (3d Cir. 1998) ("Statutory interpretation usually begins, and often ends, with the language of the statute.").

The Government further asserts that "[e]very court to have addressed the issue has held that attorneys' fees . . . can be 'other expenses' recoverable under the MVRA." Resp. Br. at 54 (citing *United States v. Afriyie*, 27 F.4th 161, 166 (2d Cir. 2022); *United States v. Chan*, 981 F.3d 39, 66 (1st Cir. 2020); *United States v. Sexton*, 894 F.3d 787, 801 (6th Cir. 2018)). Not so. In *Chan*—and its companion case, *In re Akebia Therapeutics, Inc.*, 981 F.3d 32 (1st Cir. 2020)[37]—the First Circuit expressly declined to decide the question, proceeding on the assumption that attorneys' fees could be "other expenses" under § 3663A(b)(4). *See In re Akebia,* 981 F.3d at 38 n.4 ("[B]ecause the defendants did not challenge attorney's fees as a category of expenses ripe for reimbursement . . .

---

[37] Those cases involved the same securities fraud claims brought against a defendant biostatistician, Schultz Chan, who was ordered to pay restitution to his employer Akebia Therapeutics, Inc. *Chan*, 981 F.3d at 47, 50. Both Chan and Akebia challenged the restitution order at issue in separate proceedings. *Id*. at 66 n.18. As the court noted, "Akebia's challenge to the restitution order [was] much more thorough," and it "address[ed] those arguments in a separate opinion." *Id.*

we assume without deciding that attorney's fees are proper fodder for restitution[.]"). *Sexton* is likewise no endorsement of the Government's view. There, the Sixth Circuit upheld a restitution order that included attorneys' fees under plain error review because the defendant did not dispute the restitution order at trial. 894 F.3d at 800–01. As a result, the *Sexton* court reasoned that the district court had made no specific factual findings, and it was "not clear . . . how th[o]se fees were accrued," and "hard to say that the district court committed any error." *Id*. at 801. While *Sexton* noted that some legal fees may fall "within the limits that the Supreme Court set in *Lagos*," it did so by relying on pre-*Lagos* circuit precedent[38] without analyzing the statutory text or the extent to which *Lagos* abrogated that prior case. *Id*. at 800.

---

[38] *See United States v. Elson*, 577 F.3d 713, 728 (6th Cir. 2009) (holding that "where a victim's attorney fees are incurred in a civil suit, and the defendant's overt acts forming the basis for the offense of conviction involved illegal acts during the civil trial . . . such fees are directly related to the offense of conviction and therefore are recoverable as restitution under the MVRA"), *abrogated by Lagos*, 584 U.S. 577.

Only *Afriyie* squarely held that "'other expenses' may include attorneys' fees." 27 F.4th at 170.[39] But *Afriyie* turned on the Second Circuit's standard for overruling prior panel decisions. Another panel—prior to *Lagos*—had held that attorneys' fees were recoverable, as well as "expenses (attorneys' fees or otherwise)" incurred during "the victim's own investigation of the conduct underlying the offense." *Id.* at 167 (citing *United States v. Amato*, 540 F.3d 153, 159–63 (2d Cir. 2008)). *Afriyie* recognized that *Lagos* abrogated *Amato*'s private-investigation holding but concluded that *Lagos* was not so clearly "conflict[ing], incompatibl[e], or inconsisten[t]" with *Amato*'s separate attorneys' fees holding as to free the panel from stare decisis. *Id.* at 168; *see also id.* at 170 (acknowledging that the Court was not "free to chart a new course"). Here, we are not so constrained, and for the reasons already set forth—grounded in the text and structure of § 3663A(b)(4)—we find *Amato* and *Afriyie* unpersuasive.

---

[39] Although the Government does not cite it, the Ninth Circuit once held that § 3663A(b)(4)'s reference to "other expenses" could "authorize[] the award of investigation costs and attorneys' fees in some circumstances." *United States v. Nosal,* 844 F.3d 1024, 1046 (9th Cir. 2016). *Nosal*, however, predates *Lagos* and has been abrogated. *See United States v. Sullivan*, 159 F.4th 579, 589 (9th Cir. 2025) (recognizing *Lagos*'s partial overruling of *Nosal*).

We, of course, acknowledge that the MVRA's animating purpose is "to compensate the victim for its losses and, to the extent possible, to make the victim whole." *United States v. Diaz*, 245 F.3d 294, 312 (3d Cir. 2001) (citation omitted). But that purpose has limits. *See Lagos,* 584 U.S. at 583 (explaining that "the broad general purpose of [the MVRA] does not always require us to interpret [it] in a way that favors an award"). Our task is to apply the statute Congress enacted, not to revise it in light of perceived remedial ends. *See Magwood v. Patterson,* 561 U.S. 320, 334 (2010) ("We cannot replace the actual text [of a statute] with speculation as to Congress' intent."). Accordingly, the MVRA's "remedial purposes" cannot justify reading § 3663A(b)(4) "more broadly than its language and the statutory scheme reasonably permit." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578 (1979).

In sum, we hold that § 3663A(b)(4) does not encompass a victim's attorneys' fees as "other expenses."[40] Accordingly, we will vacate the District Court's October 11, 2024 order and October 29, 2024

---

[40] Because we hold that the MVRA does not authorize restitution for attorneys' fees, we do not reach Abrams's alternative argument that some of the attorneys' claimed fees were not "necessary" within the meaning of the statute.

amended judgment to the extent that they award attorneys' fees.

## VI. Conclusion

For the foregoing reasons, we will affirm Abrams's convictions on all counts. We will vacate the District Court's October 11, 2024 amended order and October 29, 2024 amended judgment insofar as they award attorneys' fees under the MVRA and remand for entry of an amended restitution judgment consistent with this opinion.

*Counsel for Appellant*
Jason F. Ullman [Argued]
Office of Federal Public Defender

*Counsel for Appellee*
Patrick J. Bannon [Argued]
Carlo D. Marchioli
Office of United States Attorney